TERRY BARGMANN AND LISA BARGMANN, HUSBAND AND WIFE,
ET AL., APPELLANTS, V. SOLL OIL COMPANY,
A NEBRASKA CORPORATION, ET AL., APPELLEES.

JANET LUTJEN, APPELLANT, V. SOLL OIL COMPANY,
A NEBRASKA CORPORATION, ET AL., APPELLEES.

KEVIN TONJES AND JO ANN TONJES, HUSBAND AND WIFE, ET AL.,
APPELLANTS, V. SOLL OIL COMPANY, A NEBRASKA CORPORATION,
ET AL., APPELLEES.

574 N.W. 2d 478

Filed February 13, 1998.    Nos. S-96-1182, S-96-1183, S-96-1184.

Shelley A. Horak for appellants.

Clarence E. Mock, of Johnson and Mock, for appellee Soll Oil Co.

Shirley K. Williams, of Knudsen, Berkheimer, Richardson, Endacott & Routh, for appellee Derald Bargmann.

Don Stenberg, Attorney General, and William L. Howland for intervenor State of Nebraska.

CAPORALE, WRIGHT, CONNOLLY, and GERRARD, JJ.

CAPORALE, J.

## I. STATEMENT OF CASE

This appeal involves three related suits in which the plaintiffs-appellants, Terry Bargmann and Lisa Bargmann, husband and wife, and Maressa Bargmann, Alyssa Bargmann, and Mariah Bargmann, minors, by and through their father and natural guardian, Terry Bargmann, in case No. S-96-1182; Janet Lutjen in case No. S-96-1183; and Kevin Tonjes and Jo Ann

Tonjes, husband and wife, and Eric Andrews, Ellen Andrews, and Blake Tonjes, minors, by and through their mother and natural guardian, Jo Ann Tonjes, in case No. S-96-1184, assert that they suffered damages through the torts of the defendants-appellees in each case, Soll Oil Company, a Nebraska corporation; David Soll; and Derald Bargmann, doing business as Bargmann Corner Service. In each case the parties filed motions for summary judgment, and in each case the district court sustained the defendants' motions. The plaintiffs thereupon appealed to the Nebraska Court of Appeals, asserting, in summary, that the district court erred in finding that none of the defendants had (1) been negligent or (2) created a nuisance. Under our authority to regulate this court's caseload and that of the Court of Appeals, we removed the matter to this court's docket. We affirm in part, and in part reverse, and remand for further proceedings.

## II. SCOPE OF REVIEW

Summary judgment is proper only when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Chelberg v. Guitars & Cadillacs, ante* p. 830, 572 N.W.2d 356 (1998); *Battle Creek State Bank v. Preusker, ante* p. 502, 571 N.W.2d 294 (1997).

## III. FACTS

It is sufficient for purposes of this appeal to state that in each case, the plaintiffs have suffered damages as the result of petroleum contamination in and around their homes, including vapors coming from their sump pits. There is evidence that a plume of contamination runs from Derald Bargmann's service station operation to the plaintiffs' homes, which is joined by a second plume of contamination originating at the Soll Oil operation. The contamination around the plaintiffs' homes was first discovered in September 1994.

David Soll worked for Neel Oil beginning in 1976 or 1977 and purchased Neel Oil in 1977 or 1978. How or when Soll transferred his purchase to Soll Oil or whether it was Soll Oil

that made the original purchase is far from clear; we therefore refer to the operation as that of the Soll interests. In 1985, the Soll interests sold the bulk plant, which consisted of six above-ground tanks. According to Soll, none of the six tanks at the bulk plant ever leaked.

After 1985, the Soll interests' business consisted solely of a service station operated adjacent to the bulk plant location. The Soll interests stopped selling gasoline at the service station in 1992, and the tanks were removed in 1993. The tanks were not tested for tightness during the time the Soll interests sold gasoline, from 1977 to 1992. In order to determine if any product was missing, the Soll interests took a physical inventory each month and compared that figure to how much product had been sold. Soll stated that no overflows occurred while he operated the business and that no spillage ran into the pit on the property.

In 1993, the Soll interests removed the underground tanks and hired Welding Construction to take soil samples before filling the holes left by the removal. Welding Construction never informed the Soll interests of any possible contamination problems. After the tanks were excavated, there may have been a minimal amount of discoloration in the soil underneath the removed tanks. No steps were taken to clean the possibly discolored soil, and the holes were not filled for approximately 6 months, notwithstanding that the Nebraska Department of Environmental Quality had instructed that the holes be filled as soon as possible. There is evidence that the failure to fill the holes probably allowed rain and snow to collect in them. At some point, Kevin Tonjes inspected the tanks which had been dug out of the ground and noticed that some of them had holes.

Derald Bargmann leased the property from which he operates his service station beginning in 1957 and purchased it in 1960. This location has been the site of service stations selling petroleum products out of tanks since the 1920's. In approximately 1959 or 1960, Derald Bargmann's two underground storage tanks were placed above ground. According to him, the soil surrounding these two tanks was normal in color, appearance, and odor, and there were no signs that either tank had leaked.

Derald Bargmann habitually looks at his aboveground tanks on almost a daily basis and never observed any product leaking

from them. No visual inspection has ever disclosed any problems, and no employee reported any leaks. An October 3, 1994, test indicated that none of the product lines running from the pumps were leaking, and no leaks have ever been discovered or suspected.

Until the late 1960's or early 1970's, Nebraska/Iowa Supply monitored the amount of product going into and coming out of the service station tanks through the use of meters and by stick testing. No shortages or lost product was ever found. In the late 1960's or early 1970's, Derald Bargmann began conducting his own inventory and followed the same procedure formerly used by Nebraska/Iowa Supply to regularly compare the amount of product going into each tank to the amount going out. The tanks are now equipped with sight gauges, which eliminate the need for using measuring sticks. The fire marshal also annually inspects the service station.

Flora Johnson, Derald Bargmann's bookkeeper since 1984, stated that in conducting inventories, an employee gives her a daily meter reading and a stick or sight-gauge reading, which she then records. Johnson also records the amount of product delivered, which information is given by the transport drivers delivering the product, and records the readings taken before and after delivery. At the end of each week, Johnson compares the figures to check for any discrepancies. According to her, except for one occasion, these weekly figures have always matched. On that occasion, a weekly comparison of the inventory and stick measurement revealed a possible problem with one aboveground tank. Derald Bargmann then put a small amount of fuel into the suspect tank, took a stick measurement that evening, and took another stick measurement the next morning. The second measurement varied from the previous evening's measurement, and Derald Bargmann pumped the fuel out of the tank and never used it again. According to him, the soil around this tank was not discolored and did not give off an unusual odor, there were no visible leaks or holes in the tank, and it was not thought that a significant amount of product had been lost. Thus, the soil was not tested. Derald Bargmann stated that this is the only incident where a leak has been suspected. At a later time, this tank failed a leakage test. However, Derald

Bargmann had not been using this tank since the discovery of the possible leak.

Terry Bargmann worked for Derald Bargmann for 10 years. Terry Bargmann recalls only the one episode during those 10 years where a tank was found to be leaking. According to Terry Bargmann, around 1986 or 1987, after discovering a shortage in one of the tanks via a meter reading, a small amount of gasoline was put in the tank to test it. Upon finding that gasoline was being lost, use of the tank was stopped altogether. Terry Bargmann also stated that he did not notice anything out of the ordinary around the tank and could not tell just by looking at the outside of the tank that it was losing gasoline.

Derald Bargmann maintains one waste-oil tank, which has operated without incident. Some splashing around the fill pipe of the waste-oil tank has occurred, resulting in some soil discoloration. This discolored soil (a couple of feet in all) was removed in 1994. Kurt Gatzemeyer, Derald Bargmann's employee, recited the methods used by Derald Bargmann to conduct his inventory. One of Gatzemeyer's duties was putting waste oil into a tank, and while performing this task, he once caused an insignificant amount of waste oil to splash out. According to Gatzemeyer, all of the soil discolored by this splashing was removed.

Jim Heine, a deputy Nebraska State Fire Marshal whose duty it is to inspect petroleum storage tanks, stated that he inspected Derald Bargmann's operation on October 3, 1994. At that inspection, Heine told Derald Bargmann that four of his above-ground tanks no longer met the current code, after which Derald Bargmann removed them from service. According to Derald Bargmann, these removed tanks did not have any holes or show any signs of leakage. Heine also noticed some discolored soil surrounding the area of Derald Bargmann's waste-oil tank, but is of the opinion that it would take far more than the amount of spillage he saw at that time to cause the petroleum contamination problem at issue. Heine finally stated that in his opinion, Derald Bargmann's service station was operated in an appropriate manner in compliance with the standards in the petroleum marketing industry in the area.

In or around January 1995, Derald Bargmann hired Coranco, Inc., to analyze and remedy any problems at his service station. According to Coranco employee Ralph Martin, there is contamination of unknown age at the service station. Martin is of the view that the majority of the contamination at the service station is historic, dating to the 1920's, and not related to the current operations.

In Martin's view, the contamination at Derald Bargmann's service station, the Soll interests' operation, and an oil truck fire in 1959 might all have contributed to the contamination of the plaintiffs' homes. Martin testified that the Soll interests contributed to the overall contamination problem by leaving open the holes resulting from the removal of underground tanks, thereby allowing rainwater to run onto the contaminated soil. Based on his data, the contamination seems to be traveling with the ground water.

In September 1994, the Nebraska Department of Environmental Quality hired Terracon Environmental to assess and remedy the contamination problem and to pinpoint the source of the contamination. Stephen K. Bunting, a Terracon employee, is of the view that Derald Bargmann's operation is the source of contamination under the Terry Bargmann and Tonjes residences and that both Derald Bargmann's operation and the Soll interests' operation are the sources of contamination under the Lutjen residence. Bunting found no other areas of possible sources for the ground water contamination.

Bunting investigated some underground gasoline storage tanks which had been removed from the Soll interests' property and discovered that they were corroded and had holes and pitting in them. Terracon tested soil samples from the excavation area, and the results showed no significant impact. Terracon also reviewed a report on a nearby oil-truck fire occurring in 1959 and concluded that if the fire did result in a spill, it would not have contributed to the contamination at the plaintiffs' homes.

## IV. ANALYSIS

### 1. NEGLIGENCE

Ordinary negligence is defined as the doing of something that a reasonably careful person would not do under similar cir-

cumstances, or the failing to do something that a reasonably careful person would do under similar circumstances. *Traphagan v. Mid-America Traffic Marking*, 251 Neb. 143, 555 N.W.2d 778 (1996); *Hearon v. May*, 248 Neb. 887, 540 N.W.2d 124 (1995). In order to prevail in a negligence action, there must be a legal duty on the part of the defendant to protect the plaintiff from injury, a failure to discharge that duty, and damage proximately caused by the failure to discharge that duty. *Gans v. Parkview Plaza Partnership, ante* p. 373, 571 N.W.2d 261 (1997); *Whalen v. U S West Communications, ante* p. 334, 570 N.W.2d 531 (1997). Negligence and the duty to use care do not exist in the abstract, but must be measured against a particular set of facts and circumstances. *Collins v. Herman Nut & Supply Co.*, 195 Neb. 665, 240 N.W.2d 32 (1976).

Duty is a question of whether a defendant is under any obligation for the benefit of a particular plaintiff; in negligence cases, the duty is always the same—to conform to the legal standard of reasonable conduct in the light of the apparent risk. *Gans, supra*; *Anderson/Couvillon v. Nebraska Dept. of Soc. Servs.*, 248 Neb. 651, 538 N.W.2d 732 (1995). The question of whether a legal duty exists for actionable negligence is a question of law dependent upon the facts in a particular situation. *Gans, supra*; *Whalen, supra*.

In reviewing a summary judgment, an appellate court views the evidence in a light most favorable to the party against whom the judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence. *Whalen, supra*. So viewed, the evidence establishes that the contamination on the plaintiffs' properties originates at Derald Bargmann's service station and the Soll interests' operation. However, there is no evidence linking the contamination to any specific negligent act.

The mere fact that an injury or accident occurred does not raise any presumption of negligence. See, *Holden v. Urban*, 224 Neb. 472, 398 N.W.2d 699 (1987); *Bourke v. Watts*, 223 Neb. 511, 391 N.W.2d 552 (1986); *Beck v. Ideal Super Markets of Nebraska, Inc.*, 181 Neb. 381, 148 N.W.2d 839 (1967); *Watenpaugh v. L. L. Coryell & Son*, 135 Neb. 607, 283 N.W. 204 (1939). "One alleging negligence has the burden to prove

such negligence. Establishing that an accident has occurred does not prove a case of negligence. [Citations omitted.] Negligence is not presumed and must be proved by evidence, direct or circumstantial." *Holden*, 224 Neb. at 474, 398 N.W.2d at 701.

Res ipsa loquitur is a qualification of the general rule that negligence is not to be presumed. *Roberts v. Weber & Sons, Co.*, 248 Neb. 243, 533 N.W.2d 664 (1995). However, it is clear that if specific acts of negligence are alleged or there is direct evidence of the precise cause of the accident, the doctrine of res ipsa loquitur is not applicable. *Long v. Hacker*, 246 Neb. 547, 520 N.W.2d 195 (1994). Because the plaintiffs alleged specific acts of negligence in their petitions, the doctrine of res ipsa loquitur is inapplicable.

The plaintiffs argue in their briefs that Derald Bargmann was negligent in not investigating the possibility of contamination after he discovered that one of his tanks was leaking. They also urge that the Soll interests were negligent in not investigating the possible contamination in the soil underneath their excavated underground tanks.

The evidence establishes that after a routine inventory check revealed a leak in one of his tanks, Derald Bargmann did not check for any possible contamination. However, it is uncontroverted that the soil surrounding this tank showed no signs of contamination and that there were no visible leaks or holes in the tank. The evidence also establishes that the underground tanks the Soll interests excavated were corroded and that some product had leaked into the soil. But not only is there no evidence as to when the corrosion developed, it is uncontroverted that the company the Soll interests hired to analyze the soil underneath the excavated tanks never told the Soll interests of any problems.

More importantly, the plaintiffs failed to present any evidence as to the standard of care owed by one in the business of storing and selling petroleum products. One who undertakes to render services in the practice of a trade is required to exercise the skill and knowledge normally possessed by members of that trade in good standing in similar communities. *Topil v. Hub Hall Co.*, 230 Neb. 151, 430 N.W.2d 306 (1988). Noting in

*Topil* that the plaintiffs therein had offered no expert testimony to establish the skill and knowledge of framing carpenters, we held that the record failed to show a breach of any duty owed to the plaintiffs by the defendants. In *Overland Constructors v. Millard School Dist.*, 220 Neb. 220, 369 N.W.2d 69 (1985), the school district alleged that an architect was negligent in preparing the contract documents for the construction of a school building. We, however, held that because there was no evidence on the applicable standard of care owed by architects in preparing contract documents, the district court was correct in refusing to address the school district's allegation of negligence. See, also, *Gerrity Oil & Gas Corp. v. Magness*, 946 P.2d 913 (Colo. 1997) (expert testimony required in negligence cases when defendant held to standard of care outside common knowledge and experience of ordinary persons).

After the movant for summary judgment makes a prima facie case by producing enough evidence to demonstrate that the movant is entitled to judgment if the evidence were uncontroverted at trial, the burden to produce evidence showing the existence of a material issue of fact that prevents judgment as a matter of law shifts to the party opposing the motion. See, *Chelberg v. Guitars & Cadillacs, ante* p. 830, 572 N.W.2d 352 (1998); *Brown v. American Tel. & Tel. Co.*, 252 Neb. 95, 560 N.W.2d 482 (1997); *Horace Mann Cos. v. Pinaire*, 248 Neb. 640, 538 N.W.2d 168 (1995). Because with respect to Derald Bargmann the record lacks any evidence as to the applicable standard of care and because there is no evidence regarding what specific acts of negligence by him caused the contamination, the district court was correct in finding that as a matter of law the record failed to establish that he breached any duty. One cannot be negligent in failing to perform an act which one did not in the first instance have a duty or obligation to perform. *Bakody Homes & Dev. v. City of Omaha*, 246 Neb. 1, 516 N.W.2d 244 (1994). If there is no duty owed, there can be no negligence. *Collins v. Herman Nut & Supply Co.*, 195 Neb. 665, 240 N.W.2d 32 (1976).

However, with respect to the Soll interests, the situation is otherwise. In that regard, there is evidence that the Soll interests' failure to close the holes resulting from the removal of the

underground tanks contributed to the contamination. Thus, the district court was incorrect in finding that as a matter of law the record failed to establish that the Soll interests breached any duty.

## 2. NUISANCE

In the second and final assignment of error, the plaintiffs urge that the district court erred in ruling that the defendants were not liable for having created a private nuisance.

We have adopted the law of nuisance as articulated in the Restatement (Second) of Torts. See, *Kopecky v. National Farms, Inc.*, 244 Neb. 846, 510 N.W.2d 41 (1994); *Hall v. Phillips*, 231 Neb. 269, 436 N.W.2d 139 (1989). Thus, in a law action one may be subject to liability for a tortious private nuisance (1) if the defendant's conduct is a proximate cause of an invasion of another's interest in the private use and enjoyment of land and (2) if the invasion is intentional and unreasonable or is otherwise actionable under rules controlling liability for negligence or liability for abnormally dangerous conditions or activities. *Hall, supra.*

There is no evidence or claim that the storing of petroleum products in tanks is an abnormally dangerous activity; thus, we need not decide whether we would impose strict liability on either defendant for abnormally dangerous, otherwise known as ultrahazardous, activities. See *Anderson v. Nashua Corp.*, 246 Neb. 420, 519 N.W.2d 275 (1994). Next, we consider whether there is any evidence that Derald Bargmann or the Soll interests acted intentionally.

An invasion is intentional if the actor acts for the purpose of causing it or knows that it is resulting or is substantially certain to result from his or her conduct. Restatement (Second) of Torts § 825 (1979). If a defendant's conduct unavoidably results in an interference with the use and enjoyment of another's property, the interference is "intentional" in the sense that the interference was "'substantially certain to result'" from the defendant's conduct. *Hall*, 231 Neb. at 272, 436 N.W.2d at 142. There being no evidence that Derald Bargmann was negligent or acted for the purpose of causing petroleum contamination or that an invasion was substantially certain to follow from his conduct,

the district court did not err in ruling that as a matter of law he did not create a private nuisance.

However, the situation is otherwise with respect to the Soll interests. Since it cannot be determined as a matter of law that the Soll interests were not negligent, the district court erred in determining as a matter of law that they did not create a nuisance, notwithstanding a lack of evidence that they did not intentionally interfere with the plaintiffs' use and enjoyment of their property.

## V. JUDGMENT

Accordingly, the judgment of the district court is, as foreshadowed in part I, affirmed as to Derald Bargmann and reversed as to the Soll interests, and the cause is remanded for further proceedings consistent with this opinion.

AFFIRMED IN PART, AND IN PART REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.

WHITE, C.J., participating on briefs.
STEPHAN and MCCORMACK, JJ., not participating.