BRENT CERNY, APPELLANT, V. CEDAR BLUFFS
JUNIOR/SENIOR PUBLIC SCHOOL, SAUNDERS
COUNTY DISTRICT NO. 107, APPELLEE.

628 N.W.2d 697

Filed June 29, 2001.   No. S-99-1227.

Larry C. Johnson, of Johnson & Vaughan, P.C., for appellant.

Stephen S. Gealy and Timothy E. Clarke, of Baylor, Evnen, Curtiss, Grimit & Witt, for appellee.

Maren Lynn Chaloupka, of Van Steenberg, Chaloupka, Mullin, Holyoke, Pahlke, Smith, Snyder & Hofmeister, P.C., for amicus curiae Nebraska Association of Trial Attorneys.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

STEPHAN, J.

This is a personal injury action brought pursuant to the Political Subdivisions Tort Claims Act. Brent Cerny alleged that while participating in athletics as a student at Cedar Bluffs Junior and Senior High School (the School), he sustained personal injuries as a result of negligence on the part of the School and its coaching staff. Following a bench trial, the district court for Saunders County found that the School's employees were not negligent and dismissed the petition. Cerny perfected this timely appeal, which we moved to our docket pursuant to our authority to regulate the dockets of the appellate courts. See Neb. Rev. Stat. § 24-1106(3) (Reissue 1995).

## BACKGROUND

In the fall of 1995, Cerny was a student at the School and a member of its football team. On the evening of Friday, September 15, 1995, he participated in a football game between Cedar Bluffs and Beemer high schools. Mitchell R. Egger was the head coach of the Cedar Bluffs team, and Robert M. Bowman was the assistant coach. Both held Nebraska teaching certificates with coaching endorsements.

Cerny fell while attempting to make a tackle during the second quarter of the Beemer game, striking his head on the ground. Although he felt dizzy and disoriented after the fall, Cerny initially remained in the game but took himself out after a few plays. He returned to the game during the third quarter. Subsequently, during football practice on Tuesday, September 19, Cerny was allegedly injured again when his helmet struck that of another player during a contact tackling drill.

There was conflicting evidence at trial regarding the symptoms experienced and communicated by Cerny during and after the Beemer game. Cerny testified that when he came out of the game, he told Egger and Bowman that he felt dizzy, disoriented, and extremely weak. Egger stated that Cerny complained of dizziness when he came off the field during the Beemer game. He also noted that Cerny was short of breath and had a tingling sensation in his neck. Egger stated that Bowman continued to monitor Cerny.

Bowman testified that Cerny did not complain of a headache when he left the game, but did state that he felt fuzzy or dizzy, that he had some burning in his shoulder, and that he could not catch his breath. Bowman attributed Cerny's dizziness to hyperventilation, not a head injury. Bowman stated that when Cerny came out of the game, Cerny made normal eye contact with Bowman and Cerny's speech and movement appeared normal. After catching his breath, Cerny appeared to Bowman to be in a normal emotional state. However, Bowman did recommend to Egger that Cerny should get medical attention, but to his knowledge, no medical personnel examined Cerny that evening.

When Cerny asked to re-enter the game during the third quarter, Bowman observed that he seemed completely normal, exhibiting neither confusion, disorientation, nor abnormal speech. Bowman also noted that Cerny did not complain of a headache. Egger allowed Cerny to re-enter the game after observing that his color looked good, his eyes looked clear, and his speech was normal.

Cerny testified that he had a headache continuously from Friday night until the practice on Tuesday. However, there is conflicting evidence as to whether he reported this to his coaches. Cerny testified he told Bowman he had a headache during the bus

ride home after the Beemer game. However, Bowman testified that during the bus ride, he asked Cerny how he felt, and Cerny replied "I feel good, Coach" and did not complain of a headache. Cerny's mother testified that she first became aware of Cerny's headache on Saturday morning and that it persisted throughout the weekend. Cerny's brother testified that he did not attend the Beemer game but remembered Cerny "laying [sic] on the couch at our house and became very sick and complained he had a really bad headache, and then had to go to the hospital for it." Cerny testified that he told his coaches before the Tuesday practice that he had a nagging headache all weekend, but on cross-examination, he admitted that he did not remember if he had told the coaches that he was feeling bad before practice. Egger testified that he did not talk to Cerny before the Tuesday practice and permitted him to participate because "I thought he was okay, just — he was okay Friday. At least in our eyes he was okay."

Dr. Thomas A. McKnight, a family practice physician who has treated Cerny since September 1995, and Dr. Richard Andrews, a neurologist to whom Cerny was referred by McKnight, both expressed opinions that Cerny suffered a concussion during the Friday night game; that he was still symptomatic at the practice on the following Tuesday; and that during the practice, he suffered a closed-head injury with second concussion syndrome. Andrews testified that the second blow to the head sustained during the practice was "the principal cause of [Cerny's] traumatic brain injury, and the sequelae as it exists now."

Several witnesses testified regarding the standard of care to be exercised by high school coaches in dealing with head injuries. Andrews testified that dizziness, disorientation, and headache are all recognized signs of a concussion. He stated that if a football player has one or more of these symptoms during a game, he should not be permitted to participate further in that game. In addition, three certified athletic trainers testified as expert witnesses on behalf of Cerny regarding the applicable standard of care. Christina Froiland is an assistant professor of physical education and a certified athletic trainer at Midland Lutheran College in Fremont, Nebraska, who teaches a class entitled "Prevention and Care of Athletic Injuries." This class is required by the State of Nebraska for teachers seeking a coaching

endorsement. Froiland testified the typical symptoms of a concussion include dizziness, headache, and disorientation, and are generally known in the coaching profession. She further testified that when an athlete exhibits such symptoms following an injury, the coach should not permit the athlete to return to competition until receiving clearance from a physician.

Michael McCuistion is a certified athletic trainer at Lincoln East High School who also teaches coaching certification courses in Nebraska. He testified regarding the recognition of symptoms of head injuries. McCuistion explained that dizziness, disorientation, and headache are all symptoms of a concussion. He testified that coaches must be aware of this and, when an athlete exhibits such symptoms, must take the athlete out of competition until a medical evaluation has been performed.

Rick D. Bettger, a certified athletic trainer who works in Colorado and teaches undergraduate and graduate courses on the identification and treatment of athletic injuries, similarly testified regarding the symptoms of and treatment for head injuries. He testified that a student athlete who exhibits any symptoms of a concussion, including dizziness, shortness of breath, disorientation, and a flushed face, should be removed from competition immediately.

John Stineman, the head football coach at Centennial Public Schools, testified as an expert witness on behalf of the School. Stineman opined that the coaches at Cedar Bluffs acted reasonably and that he would not have acted differently in 1995. However, on cross-examination, he testified that if a coach identifies that a student athlete has been injured, then that coach should make sure that the student receives proper medical treatment. On cross-examination, Stineman engaged in the following colloquy with Cerny's counsel:

Q. [Coaches] don't have to be doctors, do they, but they just have to know enough first aid to know when a doctor's care is necessary, wouldn't you agree with that?

A. I would agree with that, yes.

Q. So a coach in that situation has to be prepared to recognize an injury and properly administer first aid to that injured athlete?

A. I would — I think that is true.

Q. And if it goes beyond the care he can give that student athlete, then referral to a physician is appropriate in your opinion?

A. In my opinion, yes.

After a bench trial, the district court dismissed the petition based upon a finding that the School was not negligent. In its written findings, the district court noted that both Egger and Bowman had a teaching certificate with a coaching endorsement. It further found that "[a]s part of the endorsement process, each had completed the requisite first aid training required by the State as part of a college level course dealing with the prevention of athletic injuries." The district court also noted that neither was a certified athletic trainer.

In concluding that the School was not negligent in identifying and treating Cerny's alleged head injury, the district court discounted the expert testimony of Froiland, McCuistion, and Bettger, all of whom where certified athletic trainers. In so doing, the district court reasoned these experts did not

coach in communities and schools similar to those employing the coaches here. Each of the experts offered by [Cerny] has a specialized level of expertise in the identification and treatment of athletic injury. Therefore, none of the experts proffered by [Cerny] meet the criteria [of] being a member of the same trade as Defendant coaches . . . .

The district court noted that "each of the experts are certified athletic trainers, having training and expertise beyond that possessed by the coaches with respect to the diagnosis of athletic injury." The district court thus discounted the testimony of the certified athletic trainers and declared that the testimony of Cedar Bluff's sole expert witness, Stineman, was authoritative on the standard of care to be exercised by football coaches. Regarding this standard of care, the district court refused to "hold a first aid trained coach to a standard of diagnostic infallibility."

Cerny perfected this timely appeal.

## ASSIGNMENTS OF ERROR

Cerny asserts, restated, that the district court (1) was clearly wrong in failing to find that Bowman and Egger were negligent because of their failure to follow the School's policy requiring

that a player be held out of practice or competition if there is any question concerning an injury to that player; (2) erred as a matter of law in concluding that the applicable standard of care was a local standard rather than a statewide or national standard of care; (3) erred as a matter of law in failing to give due consideration to the testimony of Cerny's three expert witnesses based on the faulty reasoning that such experts were not practicing coaches; (4) erred as a matter of law in concluding that Stineman's testimony was authoritative because he did not articulate and reference an applicable standard of care that justified the coaches' actions; (5) erred as a matter of law in concluding that in order for Cerny to prevail, the trial court would have to hold Bowman and Egger to a standard of diagnostic infallibility which it reasoned was a higher standard than to which physicians are held; (6) was clearly wrong in concluding that the testimony of Stineman supported the actions of Bowman and Egger and that their actions in response to Cerny's injury in the Friday game were reasonable; (7) was clearly wrong in failing to find that Bowman and Egger were negligent because they failed to advise student athletes and their parents of the signs and dangers of head injury; and (8) was clearly wrong in reaching any conclusion that Cerny was contributorily negligent and, if it did so, was wrong as a matter of law in failing to apply the comparative fault provisions of Nebraska law.

## STANDARD OF REVIEW

■ When reviewing questions of law, an appellate court has an obligation to resolve the question independently of the conclusion reached by the trial court. *North Bend Senior Citizens Home v. Cook*, 261 Neb. 500, 623 N.W.2d 681 (2001); *Doksansky v. Norwest Bank Neb.*, 260 Neb. 100, 615 N.W.2d 104 (2000).

■ In actions brought pursuant to the Political Subdivisions Tort Claims Act, the findings of a trial court will not be disturbed on appeal unless they are clearly wrong. *Desel v. City of Wood River*, 259 Neb. 1040, 614 N.W.2d 313 (2000); *Carroll v. Chase County*, 259 Neb. 780, 612 N.W.2d 231 (2000).

## ANALYSIS

■ A negligence action brought under the Political Subdivisions Tort Claims Act has the same elements as a negligence action against an individual, i.e., duty, breach of

duty, causation, and damages. *Drake v. Drake*, 260 Neb. 530, 618 N.W.2d 650 (2000). While we often state these elements in a formulaic manner, applying them to specific cases is frequently a complex endeavor.

The question of what duty is owed and the scope of that duty is multifaceted. First, and foremost, the question of whether a duty exists at all is a question of law. *Desel v. City of Wood River, supra; Ray v. Argos Corp.*, 259 Neb. 799, 612 N.W.2d 246 (2000). A court must determine whether

> upon the facts in evidence, [does] such a relation [exist] between the parties that the community will impose a legal obligation upon one for the benefit of the other—or, more simply, whether the interest of the plaintiff which has suffered invasion was entitled to legal protection at the hands of the defendant.

W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 37 at 236 (5th ed. 1984). See *Desel v. City of Wood River, supra.*

Once a court determines that a duty is owed by one party to another, it becomes necessary to define the scope and extent of the duty. In other words, the necessary complement of duty—the standard of care—must be ascertained. Keeton, *supra.* That standard is typically general and objective and is often stated as the reasonably prudent person standard, or some variation thereof; i.e., what a reasonable person of ordinary prudence would have done in the same or similar circumstances. See, *Bargmann v. Soll Oil Co.*, 253 Neb. 1018, 574 N.W.2d 478 (1998); Restatement (Second) of Torts § 283 (1965).

This basic standard, however, is not invariably applied in all negligence cases. For example, the standard is modified in circumstances in which the alleged tort-feasor possesses special knowledge, skill, training, or experience pertaining to the conduct in question that is superior to that of the ordinary person. Such a person is not held to the standard of a reasonably prudent person, but, rather, to a standard consistent with his or her specialized knowledge, skill, and other qualities. See, Restatement, *supra,* § 290, comment *f.* at 50 (stating that "[i]f the actor has special knowledge, he is required to utilize it, but he is not required to possess such knowledge, unless he holds himself out as possessing it or undertakes a course of conduct which a

reasonable man would recognize as requiring it"); *Id.*, § 299, comment *f.* at 72 (stating that "[i]f the actor possesses special competence, he must exercise it, not only in his profession, trade, or occupation, but also whenever a reasonable man in his position would realize that its exercise is necessary to the reasonable safety of others"); Dan B. Dobbs, The Law of Torts § 122 at 290 (2000) (explaining that "[a] reasonable person will act in the light of (a) knowledge shared by the community generally and also (b) information and knowledge that he himself has that is not generally known and that reasonable people would not ordinarily have"); Keeton, *supra*, § 32 at 185 (stating that "if a person in fact has knowledge, skill, or even intelligence superior to that of the ordinary person, the law will demand of that person conduct consistent with it").

■ Although we have never explicitly stated as much, determining the standard of care to be applied in a particular case is a question of law. See, Dobbs, *supra*, § 117 at 279 (noting that "[i]t cannot be too often repeated that the standard [of care] itself is a general duty prescribed by law"); Keeton, *supra*, § 37 (explaining that standard of care is legal rule and, thus, is matter of law); Restatement, *supra*, § 328 B at 151 (stating "[i]n an action for negligence the court determines . . . the standard of conduct required of the defendant by his legal duty").

■ The legal standard of care is necessarily articulated in general terms, such as a duty "to conform to the legal standard of reasonable conduct in light of the apparent risk." *Bates v. Design of the Times, Inc.*, 261 Neb. 332, 336, 622 N.W.2d 684, 687 (2001); *Turner v. Fehrs Neb. Tractor & Equip.*, 259 Neb. 313, 609 N.W.2d 652 (2000). "Since it is impossible to prescribe definite rules of conduct in advance for every combination of circumstances that may arise, and the fact situations are infinitely variable, the law resorts to formulae which state the standard in broad terms without attempt to fill it in in detail." Restatement, *supra*, § 328 C, comment *b.* at 155. We have recognized that negligence and the duty to use care do not exist in the abstract, but must be measured against a particular set of facts and circumstances. *Bargmann v. Soll Oil Co.*, 253 Neb. 1018, 574 N.W.2d 478 (1998); *Collins v. Herman Nut & Supply Co.*, 195 Neb. 665, 240 N.W.2d 32 (1976). Therefore, while the existence of a duty

and the identification of the applicable standard of care are questions of law, the ultimate determination of whether a party deviated from the standard of care and was therefore negligent is a question of fact. *Porter v. Black*, 205 Neb. 699, 289 N.W.2d 760 (1980). To resolve the issue, a finder of fact must determine what conduct the standard of care would require under the particular circumstances presented by the evidence and whether the conduct of the alleged tort-feasor conformed with the standard. See Restatement (Second) of Torts § 328 C, comment *b.* (1965). When the conduct in question involves specialized knowledge, skill, or training, expert testimony may be helpful or even necessary to a determination of what the standard of care requires under particular circumstances. See, *Bargmann v. Soll Oil Co., supra*; *Overland Constructors v. Millard School Dist.*, 220 Neb. 220, 369 N.W.2d 69 (1985). See, also, *Bates v. Design of the Times, Inc., supra.*

In the present case, it is clear that the School and the coaches it employed owed a duty to Cerny. But, as noted above, an inquiry into duty does not end with a determination that the defendant owed a legally recognizable duty to the plaintiff; it must also include a determination regarding the standard of care that a defendant must exercise in a given situation in order to fulfill the duty. The standard of care applied in this case by the district court is somewhat unclear and seems to depend upon two alternative rationales. The district court determined that the testimony of Stineman regarding the applicable standard of care was "authoritative." The district court made this statement after explaining that (1) Froiland, McCuistion, and Bettger were not members of the same trade as Egger and Bowman, as they were not coaches in communities and schools similar to Cedar Bluffs, but were certified athletic trainers and (2) that each had a specialized level of expertise in the identification and treatment of athletic injury that Egger and Bowman did not possess.

Although it stated that Stineman's testimony regarding the standard of care to be applied in this case was "authoritative," the district court did not articulate an affirmative statement of that standard, but only stated that it would not hold "a first aid trained coach to a standard of diagnostic infallibility." Furthermore, the district court variously stated that the standard was predicated

upon the care that was to be exercised by "football coaches in communities similar to Cedar Bluffs in Nebraska in 1995," but also upon the "reasonable degree of care and skill to be exercised by endorsed high school football coaches in 1995."

Egger and Bowman each possess a Nebraska teaching certificate with a coaching endorsement. Regarding these endorsements, Stineman testified as follows:

Q. And in order to obtain a coaching endorsement, is a college course in first aid required?

A. Yes, it is.

Q. Is there anything else required in terms of courses which involve the diagnosis and treatment of athletic injuries besides that first-aid course?

A. There is usually a course in care and prevention of athletic injuries. Aside from that, there are no other ones.

Both Froiland and McCuistion testified that they taught courses dealing with prevention and care of athletic injuries that a teacher must take in order to obtain a coaching endorsement in Nebraska. Bettger testified he teaches similar courses, albeit in Colorado.

Because Egger and Bowman have Nebraska teaching certificates with coaching endorsements, they necessarily possess certain specialized training and skill with respect to athletic injuries. They are not medical professionals and therefore cannot be expected or required to make medical diagnoses. However, the record reflects that the training required to obtain a coaching endorsement includes familiarization with the common symptoms of a concussion in order to enable a coach to make a reasoned determination of when to withhold a student athlete from competition until a medical professional evaluates the athlete and clearance is obtained. Thus, the appropriate standard of care to be applied to the actions of Egger and Bowman in this case is that of the reasonably prudent person holding a Nebraska teaching certificate with a coaching endorsement. The record affords no basis upon which to conclude that this standard varies from one Nebraska community to another, and the district court erred as a matter of law in so concluding.

The district court discounted the testimony of Froiland, McCuistion, and Bettger because it determined that they were "certified athletic trainers, having training and expertise beyond

that possessed by the coaches with respect to the diagnosis of athletic injury." While that may be true, it does not render them incompetent to testify regarding standard of care issues. As we have noted, the record reflects that Froiland and McCuistion personally taught courses which impart the specialized knowledge concerning athletic injuries that a person must have in order to receive a coaching endorsement in this state. As such, they possessed the requisite knowledge, skill, and experience to testify regarding both what conduct the standard of care would require under the particular factual circumstances at issue, and whether that standard of care was breached by the School's coaching staff. Therefore, we conclude that the district court erred in discounting the testimony of Froiland and McCuistion on these issues.

## CONCLUSION

The errors of the district court in determining the applicable standard of care and discounting the testimony of Froiland and McCuistion were prejudicial to Cerny and necessitate a new trial. The applicable standard of care by which the conduct of the School's coaching staff should be judged is that of the reasonably prudent person holding a Nebraska teaching certificate with a coaching endorsement. On remand, in order to determine the existence of negligence, the district court must determine, as the finder of fact, what conduct was required by that standard under the circumstances of this case and whether Egger and Bowman acted in conformity therewith.

REVERSED AND REMANDED FOR A NEW TRIAL.