HONGNING FU, APPELLANT AND CROSS-APPELLEE, V.
STATE OF NEBRASKA, STATE OF NEBRASKA BOARD OF REGENTS,
UNIVERSITY OF NEBRASKA, DOING BUSINESS AS
UNIVERSITY OF NEBRASKA MEDICAL CENTER,
APPELLEE AND CROSS-APPELLANT.

643 N.W.2d 659

Filed May 17, 2002.   No. S-01-037.

Steven H. Howard, of Law Offices of Ronald J. Palagi, P.C., for appellant.

David D. Ernst and Lisa M. Meyer, of Gaines, Pansing & Hogan, for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, MCCORMACK, and MILLER-LERMAN, JJ.

HENDRY, C.J.

## INTRODUCTION

Hongning Fu, a former graduate student at the University of Nebraska Medical Center College of Pharmacy (UNMC), brought suit against UNMC pursuant to the State Tort Claims Act seeking to recover for injuries he sustained in a laboratory explosion. The court found in favor of UNMC. In its order, the court concluded that although Fu's dissertation chairperson, Jonathan Vennerstrom, Ph.D., was negligent in failing to monitor Fu more closely, Vennerstrom's negligence was not a proximate cause of the explosion which injured Fu. Fu appealed, and UNMC cross-appealed. We moved the case to our docket pursuant to our authority to regulate the caseloads of this court and the Nebraska Court of Appeals. See Neb. Rev. Stat. § 24-1106(3) (Reissue 1995).

## FACTUAL BACKGROUND

In 1981, Fu received a bachelor's degree in pharmaceutical studies from the West China University of Medical Sciences. In 1984, Fu was awarded a master's degree in medical pharmaceutical sciences from Shandong Medical University in China and thereafter worked as an organic chemistry instructor at the Shandong University Department of Pharmacy from 1984 to 1990. In 1990, Fu was admitted as a graduate student at UNMC.

Vennerstrom, an associate professor at UNMC since 1987, was Fu's advisor and the chairperson of Fu's doctoral dissertation committee. Vennerstrom's main area of research was focused upon the creation of a synthetic antimalarial drug and involved experiments with chemical compounds known as tetraoxanes. While serving as Fu's chairperson, Vennerstrom prepared a grant proposal for the World Health Organization (WHO) involving his antimalarial research. Fu was identified in the WHO grant proposal as a student researcher working under Vennerstrom.

In order to be admitted as a doctoral student in the College of Pharmacy, one must prepare a dissertation proposal which sets out the intended area of research he or she will pursue. Fu's dissertation topic was related to the WHO grant and dealt with the "Activity Relationship of 1,2,4,5-Tetraoxanes." Fu's written dissertation proposal set out intended experiments with both "bridged" and "unbridged" tetraoxanes. Bridged tetraoxanes are

unstable and more likely to explode than unbridged tetraoxanes. Vennerstrom's tetraoxane research, in association with the WHO grant, and Fu's dissertation proposal both involved the use of concentrated hydrogen peroxide (peroxide). Concentrated peroxide can explode if not handled properly.

Fu studied at UNMC from 1990 to 1993. His studies included both classwork and laboratory work related to his dissertation and the WHO grant. As part of his laboratory work, Fu kept notebooks in which he recorded the experiments performed, the procedures utilized, and the experiment results. Fu completed three notebooks and was working in a fourth when the explosion occurred. All of the experiments undertaken by Fu related to creating unbridged tetraoxanes, except for four experiments recorded in the fourth notebook between May 28 and June 11, 1993. These four experiments were labeled "HF-4-13," "HF-4-18," "HF-4-20," and "HF-4-21." Fu began HF-4-13 on May 28. The experiment which caused the explosion was HF-4-21. Fu began HF-4-21 on June 11, and it exploded that same day.

According to Fu, HF-4-13, HF-4-18, HF-4-20, and HF-4-21 were attempts to create bridged tetraoxanes and were a component of Fu's area of research. Fu asserted that Vennerstrom designed all the experiments contained in the four notebooks and directed Fu to perform them.

At trial, Fu contended that Vennerstrom directed Fu to perform HF-4-21 as part of the WHO grant, without providing Fu with adequate supervision, protective safety gear, or information or warning that HF-4-21 could result in an explosive compound. Fu also asserted that he had no knowledge that HF-4-21 had been previously attempted by other researchers or that HF-4-21 could result in an explosive substance. Fu further claimed that he was not wearing gloves when the explosion occurred on June 11, 1993, because there were no gloves in the laboratory.

Fu testified that while in China, he had never worked with high concentrations of peroxide or conducted experiments involving tetraoxanes. Fu explained that his dissertation proposal was undertaken in conjunction with the WHO grant and that HF-4-21 was part of Vennerstrom's research for the WHO grant. Fu testified that no one besides himself wrote in his four laboratory notebooks or performed the experiments recorded.

Fu stated that when he began his studies with Vennerstrom, Vennerstrom gave him a large quantity of articles and other information to read regarding Vennerstrom's tetraoxane research. However, Fu asserted that Vennerstrom had never given him exhibit 17, a German article specifically describing HF-4-21. This article states that HF-4-21 produces an explosive triperoxide. Fu stated he had never seen exhibit 17 until he brought suit against UNMC, when Vennerstrom produced the article in response to a discovery request. Fu also stated he could not read German. Fu explained that if he had read the German article, he would have asked Vennerstrom why he was directing him to do such a dangerous experiment. Fu also testified that two previous experiments in the course of his work for Vennerstrom, involving unbridged tetraoxanes and recorded in laboratory notebooks one and three, had resulted in explosions.

On cross-examination, Fu agreed that he was able to translate German with the help of a dictionary and did some German translation work for Vennerstrom. However, Fu maintained that Vennerstrom never gave him the German article. He agreed that HF-4-21 was "probably" what caused the explosion, but stated that he did not know himself which experiment exploded. Fu explained that his intention in performing HF-4-21 was to synthesize a bridged tetraoxane in conjunction with the WHO grant and that he did not know that HF-4-21 would produce an explosive compound. Fu also agreed that Vennerstrom gave him information on the type of protective gear to wear when working with concentrated peroxide. He further testified, however, that such gear was not always available in the laboratory.

Vennerstrom's testimony, for the most part, presents a completely different version of the facts. Vennerstrom testified that he gave Fu a large amount of written material concerning Vennerstrom's work with tetraoxanes when Fu began his studies and that he expected Fu to read all this material. Included in this material was the German article on HF-4-21 (exhibit 17). Vennerstrom further testified that although experiments involving bridged tetraoxanes were included in Fu's dissertation proposal, it was later agreed that Fu's experiments would involve only unbridged tetraoxanes.

Vennerstrom went on to explain that the decision to exclude bridged tetraoxanes from Fu's work was based on the fact that Vennerstrom had already completed sufficient experiments on bridged tetraoxanes for purposes of his research for the WHO grant proposal. Vennerstrom testified he discussed this with Fu and that they agreed that Fu's dissertation would therefore involve only unbridged tetraoxanes.

Notwithstanding this agreement, Vennerstrom testified that in mid-May 1993, Fu requested permission from Vennerstrom to attempt some bridged tetraoxane experiments. Vennerstrom explained he instructed Fu not to undertake any such experiments. During the 2-week period preceding the explosion on June 11, Fu continued to seek authorization from Vennerstrom to conduct such experiments, and Vennerstrom continued to direct him not to attempt them.

Vennerstrom's office was located across the hall from the laboratory where Fu performed his experiments. Vennerstrom testified that he typically spoke with Fu two to three times a week about his work and periodically checked the experiments and results recorded in Fu's notebooks. Vennerstrom did not check Fu's notebooks between May 28, 1993, and the time of the explosion. Vennerstrom testified he had no knowledge that Fu began doing experiments on May 28 in which he attempted to create bridged tetraoxanes. Vennerstrom acknowledged that he knew Fu was working in the laboratory during this time period, but stated that he had no knowledge of Fu's specific experiments other than the fact that Fu was "generally working in the area of chemistry."

According to Vennerstrom, HF-4-21 was an unauthorized experiment which Fu undertook without Vennerstrom's knowledge. Vennerstrom stated that he believed and trusted that Fu would accept his directions and not conduct experiments related to bridged tetraoxanes and that he had no reason to believe Fu would attempt HF-4-21.

Regarding the circumstances surrounding the accident, the evidence showed that Fu began working on HF-4-21 on June 11, 1993. This reaction involved mixing 70 percent peroxide with dichloromethane, methanesulfonic acid, and acetonylacetone.

There was further evidence that after combining the above ingredients, Fu carried HF-4-21 in a glass beaker to an adjoining laboratory to use the "roto-vapper." Another student working in the adjoining laboratory, Sudha Vippagunta, testified that Fu used the "roto-vapper" to evaporate the liquid in the beaker, resulting in a substance that was thick and looked somewhat like a "cotton ball." According to Vippagunta, Fu seemed surprised by the result, showing the beaker to Vippagunta while stirring it with a glass rod. Vippagunta testified that the only protective gear Fu was wearing at the time was a pair of gloves.

Shortly thereafter, Fu returned to his laboratory with the beaker, and within 2 or 3 minutes, the explosion occurred. At the time of the explosion, Fu was wearing glasses and a face shield, but no gloves.

Several people arrived soon after the explosion. First was William Elmquist, Ph.D., who was on the same floor and heard a loud bang. He wrapped Fu's left hand, which was bleeding, in a laboratory coat. Vennerstrom arrived next. Shortly thereafter, John Hauser, who was the director of safety for UNMC, and James Rhone, who was the director of the hazardous materials program for the University of Nebraska, also arrived. Emergency personnel were called, and Fu was taken to the hospital. As a result of the injuries sustained in the explosion, Fu's left ring finger and half of his left middle finger were amputated. The tip of his left little finger was also damaged.

After Fu was taken to the hospital, Hauser, Rhone, and Vennerstrom examined the laboratory and discovered Fu's notebook, opened to HF-4-21. Vennerstrom looked at the notebook and, according to the testimony of Rhone and Hauser, expressed surprise that Fu was working on this experiment.

Two expert witnesses testified on behalf of Fu: Kevin Woller, Ph.D., and Jeffrey Aube, Ph.D. Woller testified that although a portion of his graduate studies in chemistry involved working with peroxides, he had never himself worked with tetraoxanes. He agreed that it was "lore" among chemistry students, professors, and researchers that peroxides can be dangerous, stating that "[w]henever I had mentioned I was doing peroxide chemistry, they've asked if I had all ten fingers."

Woller testified that in his opinion, HF-4-13, HF-4-18, HF-4-20, and HF-4-21 were all experiments within the scope of Fu's dissertation proposal and the WHO grant. He based this opinion upon his belief that all four experiments were intended to produce a bridged tetraoxane. However, Woller also testified that there were differences between HF-4-21 and the three previous experiments. He testified that the "first three [experiments] are the same reaction. The last one [HF-4-21] is different." In comparing the chemical composition of the experiments, Woller stated, "HF-4-21 is just a straight chain aliphatic diketone, whereas the previous three, all being the same, involve a cyclic diketone." Woller also testified that while the reaction involved in HF-4-13, HF-4-18, and HF-4-20 was listed in Fu's dissertation proposal and the WHO grant, the reaction involved in HF-4-21 was "not specifically described" in either Fu's dissertation proposal or the WHO grant proposal.

Finally, Woller acknowledged that the literature regarding the reaction involved in HF-4-21 showed that the resulting compound was either a "triperoxide" or "polymeric peroxide" and that HF-4-21 had never produced a bridged tetraoxane. Woller stated during cross-examination:

[Defense counsel:] You think HF-4-21 in theory could make a bridged tetraoxane, instead of one of these [other two compounds]?

[Woller:] That's right.

Q. It's never been done, has it?

A. It has never been done.

Q. You've never tried it?

A. I certainly haven't tried it.

Q. You wouldn't try it, would you?

A. I don't have any plans to try it, no.

Q. It would be a dangerous experiment, wouldn't it?

A. It would be, but a lot of experiments are dangerous.

Woller further stated that during his research regarding HF-4-21, he found exhibit 17 (the German article) within a half hour to an hour. Woller also testified that had Fu researched HF-4-21, Woller would have expected Fu to realize that HF-4-21 would produce a "shock-sensitive compound." Finally, Woller agreed that it was a "bad idea" for Fu to walk around with a

compound containing acetonylacetone and peroxide and that graduate students generally are expected to do their own independent research on the experiments they perform.

Aube, Fu's other expert, was a professor of medicinal chemistry. Aube had never worked directly with peroxides or tetraoxanes. He testified that in his opinion, most of the experiments conducted by Fu for Vennerstrom throughout Fu's studies were inherently unsafe because of the "scale" or amount of material being used. Aube testified that when working with inherently dangerous compounds, the smallest amount of material necessary should be used because the amount of material affects the severity of any possible explosion. He opined that 20 grams of peroxide, as was used in HF-4-21, was an unsafe quantity of material. He also opined that HF-4-21 was "within the scope" of Fu's dissertation and the WHO grant because he believed HF-4-21 was intended to produce a bridged tetraoxane.

On cross-examination, Aube agreed that it was "lore" in the chemistry field that peroxides are dangerous. He testified that he would expect someone in Fu's position to know that HF-4-21 could be unstable and that a good chemist would find the relevant articles dealing with the experiments being attempted. He also agreed with Woller that the reaction involved in HF-4-21 was not listed in either Fu's dissertation proposal or in the WHO grant proposal, in that neither document contained a "recipe or formula or specific description of [HF-]4-21." Finally, he described Fu's actions in walking around with the HF-4-21 compound and stirring it with a glass rod as "dangerous" and "possibly" reckless.

In its defense, UNMC presented testimony from various witnesses, including, inter alia, Edward Clennan, Ph.D.; Rhone; James Wood, Ph.D.; and Hauser. Clennan, a chemist and "worldwide" lecturer on peroxides, opined that there was no relationship between Fu's dissertation proposal, the WHO grant, and HF-4-21 for two reasons. First, Clennan testified that the German article made it clear that HF-4-21 would not produce a bridged tetraoxane, but a triperoxide. Second, the ratio of the chemical ingredients in HF-4-21 could not possibly result in the formation of a bridged tetraoxane. Therefore, Clennan opined that HF-4-21 was clearly outside the scope of Fu's dissertation and the WHO grant.

Clennan also opined that the scale of Fu's experiments throughout the four notebooks was safe. He testified that although the scale of some of the experiments was "fairly large," the scale was "quite" appropriate in the context of the methodology employed. Clennan explained that the general pattern followed by Fu was to initially run the experiment on a small scale and then run it again on a larger scale. He agreed that HF-4-21 was not initially attempted on a small scale, but stated this was a mistake on Fu's part. He also agreed that the more concentrated the peroxide, the more likely it is to explode, and that it was "lore" in the chemistry field that concentrated peroxide was dangerous to work with without proper safety precautions. Finally, Clennan testified that Fu should not have picked up the beaker containing HF-4-21.

Rhone testified that he held a bachelor's degree in chemistry and a master's degree in organic chemistry. Rhone opined that HF-4-21 was outside the scope of Vennerstrom's research and that Vennerstrom would never authorize a student to undertake HF-4-21 because it was dangerous. Rhone stated that when Vennerstrom saw the notebook, Vennerstrom seemed surprised that Fu was conducting this type of experiment. Rhone also testified regarding the manner in which graduate students are expected to conduct themselves, stating "the student should leave no stones unturned to read up on the chemicals that he's mixing, that he's working with."

Wood, a member of Fu's dissertation committee, testified that concentrated peroxide, whether at 50 percent strength or higher, was a dangerous substance. He further testified that graduate students do not typically run all of the experiments set out in a dissertation proposal, as the proposals often evolve and change over the course of a student's studies.

Finally, Hauser testified that there had been no safety violations or reported explosions in Vennerstrom's laboratory prior to the explosion in this case. He also testified that when he, Vennerstrom, and Rhone found the notebook opened to HF-4-21 on June 11, 1993, Vennerstrom indicated that Fu was not supposed to be working on this type of experiment.

On November 30, 2000, the trial court issued a written order finding in favor of UNMC. In its order, the trial court made

findings that generally adopted Vennerstrom's version of the facts surrounding the explosion and rejected Fu's. The court found that although Vennerstrom was negligent in "failing to monitor Plaintiff's activities more closely," such negligence was not a proximate cause of Fu's injuries. The court specifically found in its order that although "[t]he experiment was part of Plaintiff's dissertation . . . Dr. Vennerstrom would not have been able to foresee Plaintiff conducting <u>this</u> experiment in the manner in which it was performed, and, therefore, could not foresee the risk of injury." (Emphasis in original.) The court went on to find:

> Did Dr. Vennerstrom direct the Plaintiff to perform the experiment? The Court believes not. . . .
>
> . . . .
>
> . . . [E]ven if Dr. Vennerstrom had done a better job of monitoring Plaintiff, Dr. Vennerstrom would not have known what experiment Plaintiff was performing on June 13 [sic], 1993 unless Dr. Vennerstrom's monitoring schedule happened to have coincided with the date of the explosion, or unless he checked on Plaintiff everyday [sic], which is clearly not the norm for students of Plaintiff's knowledge and history.
>
> . . . .
>
> . . . Would the explosion have occurred had Dr. Vennerstrom done a better job of monitoring his student? Plaintiff did not advise his supervisor he was conducting this experiment and even had Dr. Vennerstrom checked Plaintiff's workbook 2 days prior to the explosion, rather than 2 weeks, Dr. Vennerstrom would not have been able to foresee Plaintiff conducting <u>this</u> experiment in the manner in which it was performed, and, therefore, could not foresee the risk of injury.

The court made additional findings concluding that Fu should have known HF-4-21 was dangerous, that Vennerstrom had given Fu the German article stating that HF-4-21 produced an explosive triperoxide, and that Fu had been told by Vennerstrom not to do the experiment.

Finally, the court found that Fu's actions in walking around with HF-4-21 and stirring it with a glass rod were "hazardous and reckless," noting:

Plaintiff was clearly not a freshman chemistry student, but a [graduate student] working towards his doctorate, and, at this point in time, had over 10 years of research experience. Plaintiff's supervisor did not have a duty to watch every move Plaintiff made in the lab. . . . Plaintiff made a mistake in judgment and this Court finds that this mistake in judgment was not limited to Plaintiff's failure to wear the proper gloves, but to the entire span of Plaintiff's activities on June 13 [sic], 1993. . . .

The Court, therefore, finds that that [sic] the risk was not foreseeable by the Defendants and that the proximate cause of Plaintiff's damage was Plaintiff's negligence.

## ASSIGNMENTS OF ERROR

Fu asserts, rephrased, summarized, and renumbered, that the trial court erred in (1) finding that Vennerstrom's negligent supervision of Fu was not a proximate cause of the explosion, (2) finding that Vennerstrom did not instruct Fu to conduct HF-4-21, (3) making other factual determinations which are clearly wrong, (4) finding that Fu was aware of the dangers associated with the experiments he conducted, (5) holding Fu to the same standard of care as Vennerstrom in finding Fu negligent, and (6) finding that Fu assumed the risk involved in conducting HF-4-21.

## CROSS-APPEAL

UNMC asserts in its cross-appeal, rephrased, that the trial court erred in finding (1) Vennerstrom had a legal duty toward Fu with regard to the explosion caused by HF-4-21 and (2) Vennerstrom breached a legal duty in failing to monitor Fu's activities more closely.

## STANDARD OF REVIEW

■ When reviewing questions of law, an appellate court has an obligation to resolve the question independently of the conclusion reached by the trial court. *Cerny v. Cedar Bluffs Jr./Sr. Pub. Sch.*, 262 Neb. 66, 628 N.W.2d 697 (2001); *Claypool v. Hibberd*, 261 Neb. 818, 626 N.W.2d 539 (2001).

■ In actions brought pursuant to the State Tort Claims Act, the factual findings of the trial court will not be disturbed on appeal unless they are clearly wrong, and when

determining the sufficiency of the evidence to sustain the verdict, it must be considered in the light most favorable to the successful party. Every controverted fact must be resolved in favor of such party, and it is entitled to the benefit of every inference that can reasonably be deduced from the evidence. See, *Cerny, supra*; *Norman v. Ogallala Pub. Sch. Dist.*, 259 Neb. 184, 609 N.W.2d 338 (2000).

## ANALYSIS
### LEGAL DUTY

The threshold issue in any negligence action is whether the defendant owes a legal duty to the plaintiff. *Claypool, supra.* If there is no legal duty, there is no actionable negligence. *Id.* We therefore determine at the outset to address UNMC's first assignment of error in its cross-appeal, in which UNMC contends the trial court erred in finding that UNMC owed a legal duty to Fu regarding the explosion, for if there is no legal duty, there can be no actionable negligence. See *id.* Whether a legal duty exists for actionable negligence is a question of law dependent on the facts in a particular situation. *Id.*

In determining whether a legal duty exists, this court employs a risk-utility test, considering (1) the magnitude of the risk, (2) the relationship of the parties, (3) the nature of the attendant risk, (4) the opportunity and ability to exercise care, (5) the foreseeability of the harm, and (6) the policy interest in the proposed solution. *Sharkey v. Board of Regents*, 260 Neb. 166, 615 N.W.2d 889 (2000). We have further stated:

> " 'Foreseeability as it impacts duty determinations refers to " 'the knowledge of the risk of injury to be apprehended. The risk reasonably to be perceived defines the duty to be obeyed; it is the risk reasonably within the range of apprehension, of injury to another person, that is taken into account in determining the existence of the duty to exercise care.' " . . .' "
>
> . . . .
>
> . . . "[T]he law does not require precision in foreseeing the exact hazard or consequence which happens; it is sufficient if what occurs is one of the kinds of consequences which might reasonably be foreseen."

*Id.* at 179, 181, 615 N.W.2d at 900-01 (quoting *Knoll v. Board of Regents*, 258 Neb. 1, 601 N.W.2d 757 (1999)).

The evidence in this case shows that explosions are a foreseeable risk in the context of a chemistry student's graduate research involving concentrated peroxide. Regarding the relationship of the parties, instructors generally have a legal duty to supervise students in a nonnegligent manner. See, *Norman, supra*; *Johnson v. School Dist. of Millard*, 253 Neb. 634, 573 N.W.2d 116 (1998); *Brahatcek v. Millard School District*, 202 Neb. 86, 273 N.W.2d 680 (1979). This duty is illustrated in the present case from the evidence that when Fu began his work, Vennerstrom gave Fu materials about tetraoxane research and the safety precautions Fu should take when conducting experiments. Vennerstrom also monitored Fu's work regularly. We determine that UNMC owed a legal duty to Fu and, accordingly, turn to the errors raised on appeal by Fu.

PROXIMATE CAUSE

In his first assignment of error, Fu asserts the trial court erred in finding that Vennerstrom's negligent supervision of Fu was not a proximate cause of the explosion. In order to recover in a negligence action brought pursuant to the State Tort Claims Act, the plaintiff must show a legal duty owed by the defendant to the plaintiff, a breach of such duty, causation, and damages. See *Cerny v. Cedar Bluffs Jr./Sr. Pub. Sch.*, 262 Neb. 66, 628 N.W.2d 697 (2001). Foreseeability, in the context of a legal duty, is a question of law. *Sharkey, supra*. See, also, *Cerny, supra*. Fu, however, raises no error with regard to the trial court's finding that Vennerstrom owed a legal duty to Fu or that Vennerstrom breached that legal duty. Instead, Fu challenges the trial court's factual finding that there was no causation in that Vennerstrom's negligence was not a proximate cause of the explosion.

Foreseeability in the context of proximate cause is a question of fact. *Sharkey, supra*. In actions brought pursuant to the State Tort Claims Act, the factual findings of the trial court will not be disturbed on appeal unless they are clearly wrong, and when determining the sufficiency of the evidence to sustain the verdict, it must be considered in the light most favorable to the successful party. Every controverted fact

must be resolved in favor of such party, and it is entitled to the benefit of every inference that can reasonably be deduced from the evidence. See, *Cerny, supra*; *Norman v. Ogallala Pub. Sch. Dist.*, 259 Neb. 184, 609 N.W.2d 338 (2000).

■ The question at issue in evaluating Fu's first assignment of error is whether the trial court was clearly wrong in finding that Vennerstrom's negligent supervision was not a proximate cause of Fu's injuries. See *Johnson, supra*. Proximate cause is a cause that (1) produces a result in a natural and continuous sequence and (2) without which the result would not have occurred. *Norman, supra*. The general test of causation is whether, after the occurrence, the injury appears to be the reasonable and probable consequence of the defendant's negligent acts or omissions. *Brown v. Social Settlement Assn.*, 259 Neb. 390, 610 N.W.2d 9 (2000). Fu argues in his brief that the trial court's finding that the explosion was not foreseeable is clearly wrong because "Dr. Vennerstrom knew or should have known it was possible (even likely) that Mr. Fu was performing experiments he had supposedly been told not to conduct." Brief for appellant at 26.

■ Foreseeability in the context of proximate cause relates to the question of whether the specific act or omission of the defendant was such that the ultimate injury to the plaintiff reasonably flowed from the defendant's breach of duty. *Knoll v. Board of Regents*, 258 Neb. 1, 601 N.W.2d 757 (1999).

The trial court in its order stated:

> [E]ven if Dr. Vennerstrom had done a better job of monitoring Plaintiff, Dr. Vennerstrom would not have known what experiment Plaintiff was performing on June 13 [sic], 1993 unless Dr. Vennerstrom's monitoring schedule happened to have coincided with the date of the explosion, or unless he checked on Plaintiff everyday [sic], which is clearly not the norm for students of Plaintiff's knowledge and history.
>
> . . . .
>
> . . . [T]here must be a legal duty on the part of the Defendant to protect the Plaintiff from injury, a failure to discharge that duty, and damage proximately caused by the failure to discharge that duty. As Plaintiff has argued, the

Defendant had a duty to protect the [Plaintiff] from injury. Was the risk of injury foreseeable and did the Defendant fail to see the risk, thereby failing to discharge its duty?

. . . [E]ven had Dr. Vennerstrom checked Plaintiff's workbook 2 days prior to the explosion, rather than 2 weeks, Dr. Vennerstrom would not have been able to foresee Plaintiff conducting this experiment in the manner in which it was performed . . . .

. . . .

. . . by carrying this unstable solution in a hazardous and reckless manner [and] disregarding all safety procedures, precautionary measures and warnings.

The trial court's conclusion that the explosion was not foreseeable was based on two factual findings. The first was its finding that Vennerstrom "would not have known what experiment Plaintiff was performing on June 13 [sic], 1993 unless Dr. Vennerstrom's monitoring schedule happened to have coincided with the date of the explosion, or unless he checked on Plaintiff everyday [sic], which is clearly not the norm for students of Plaintiff's knowledge and history."

The record is undisputed that Vennerstrom had not checked Fu's notebook from May 28 to June 10, 1993. The issue presented is whether the record supports the trial court's finding that even had Vennerstrom checked Fu's notebook at any time between May 28 and June 10 and observed that Fu was performing HF-4-13, HF-4-18, or HF-4-20, Vennerstrom would not have foreseen Fu attempting HF-4-21 on June 11.

We find that the record supports such finding, given the dissimilarities between the experiments. Woller, one of Fu's experts, acknowledged that HF-4-21 was "different" from the prior three experiments. He testified that the three earlier experiments all involved the same reaction, essentially mixing concentrated peroxide and ketone. In contrast, HF-4-21 involved mixing concentrated peroxide with a different ingredient, acetonylacetone. Woller also testified that the reaction involved in the three earlier experiments was listed in the WHO grant. However, as Woller acknowledged, the WHO grant, in conjunction with which Fu was supposedly conducting HF-4-21, contained no reaction involving concentrated peroxide and acetonylacetone. Furthermore, Woller

acknowledged that while the reaction involved in the three earlier experiments was intended to produce a bridged tetraoxane, HF-4-21 had never produced a bridged tetraoxane. Aube agreed with Woller that HF-4-21 involved the mixture of concentrated peroxide with acetonylacetone, a reaction not described in the WHO grant. Clennan, UNMC's expert, testified that while the reaction involved in HF-4-13, HF-4-18, and HF-4-20 was an attempt to create a bridged tetraoxane, HF-4-21 was not. According to Clennan, HF-4-21 would produce a triperoxide, not a bridged tetraoxane.

The second factual finding made by the trial court was that Vennerstrom could not have foreseen Fu's "conducting this experiment in the manner in which it was performed . . . by carrying this unstable solution in a hazardous and reckless manner, disregarding all safety procedures, precautionary measures and warnings." Again, we find the record supports such finding.

With respect to the manner in which Fu conducted HF-4-21, Woller, Aube, and Rhone testified that a graduate student should research an experiment before attempting it. Woller also testified that proper research would have informed Fu that HF-4-21 would produce an explosive compound. Woller, Aube, and Clennan all agreed that it was a mistake for Fu to carry the mixture and stir it. Aube, Fu's own expert, agreed that Fu's actions in conducting HF-4-21 could be considered dangerous and possibly reckless.

The trial court found that Vennerstrom's negligence was not a proximate cause of the explosion. In considering the evidence in the light most favorable to UNMC and giving to UNMC the benefit of every reasonable inference that can be deduced from the evidence, we cannot conclude that the trial court's factual finding on the issue of proximate cause was clearly wrong. See *Norman v. Ogallala Pub. Sch. Dist.*, 259 Neb. 184, 609 N.W.2d 338 (2000). Fu's first assignment of error is without merit.

### REMAINING ASSIGNMENTS OF ERROR

In his second assignment of error, Fu argues the court erred in finding that Vennerstrom did not direct Fu to conduct HF-4-21.

In a bench trial of a law action, the court, as the trier of fact, is the sole judge of the credibility of the witnesses and the weight to be given their testimony. . . . This court will not reweigh the testimony or reevaluate the credibility of the witnesses, but it will review the evidence to determine whether the trial court made findings which are clearly wrong.

*Johnson v. School Dist. of Millard*, 253 Neb. 634, 637, 573 N.W.2d 116, 119 (1998).

At trial, Vennerstrom testified that he did not direct Fu to conduct HF-4-21. Rhone and Hauser testified that when they discovered Fu's notebook after the explosion, Vennerstrom expressed surprise that Fu was attempting HF-4-21. While Fu's testimony on this issue directly contradicted Vennerstrom's, questions regarding credibility are solely the province of the trier of fact. See *Johnson, supra*. Based on our review of the record, the trial court's finding that Vennerstrom did not instruct Fu to do HF-4-21 is not clearly wrong.

In his third assignment of error, Fu asserts the trial court "made several factual determinations regarding Mr. Fu's past training and experience that are clearly wrong." Brief for appellant at 35. Fu first asserts that the court erroneously found Fu had been a medical doctor in China. Although the order does state that "[i]n his Application to Graduate College (Exhibit #117), Plaintiff stated he had a medical degree," the trial court's order does not contain a finding that Fu was a medical doctor in China, nor does the order refer to Fu as a medical doctor or physician. Also, as noted in the factual background, Fu does have a medical degree in pharmaceutical sciences. This contention by Fu is without merit.

Fu also contends that the trial court erred in finding Fu had extensive experience with peroxides. Fu cites in his brief to pages 16 and 17 of the trial court's order for this alleged error, but the court makes no such finding on those pages or elsewhere in the order. On page 17 of the order, the court noted, "[Fu] also stated that he never worked with high concentrations of peroxide in China, nor did he ever do unbridged or bridged tetraoxides [sic] in China." Fu's assertion that the court found Fu had extensive experience with peroxides is without merit.

Fu also asserts that the trial court erred in finding Fu's experiment was flawed because of the concentration of the peroxide when, according to Fu, the flaw was the scale or quantity of the chemicals used. The trial court's order reads:

Dr. Woller stated that if Plaintiff had done the experiment correctly rather than adjusting the variables, the experiment would have been safe, even with a higher percent peroxide. . . .

Professor Aube believed that Plaintiff was conducting his experiments on too large a scale. Dr. Wood stated that 50% peroxide was very high and dangerous, and Dr. Clennon [sic] testified that the chance of a bigger explosion was greater the higher the peroxide used.

The trial court's order lists several factors which contributed to the dangerousness of HF-4-21. The trial court's order shows that the court considered the variables in the experiment, the scale of the experiment, and the concentration of the peroxide in assessing the dangerousness of the experiment. The court's basis for finding that HF-4-21 was a flawed experiment was not clearly wrong.

In his fourth assignment of error, Fu contends the trial court erred in finding that Fu was aware of the dangers associated with the experiments he conducted. The trial court's order states, "[Fu] claims to have had other explosions . . . . The Plaintiff, therefore, knew of the danger involved in his work, yet paraded around the lab with a shock sensitive substance." As indicated in the above-quoted language from the trial court's order, the court found that Fu was aware of the risks of his work based on Fu's testimony that he had run two previous experiments which resulted in explosions prior to June 11, 1993. There is also evidence from Woller, Aube, and Clennan that experiments involving peroxides are, as a matter of "lore," known to be dangerous in the field of chemistry. Finally, the trial court found that Fu had been given the German article discussing the explosive triperoxide produced by HF-4-21. Based on the record, we cannot say that the trial court's finding that Fu was aware of the dangers associated with the experiments he conducted was clearly wrong.

In his fifth assignment of error, Fu asserts that the trial court erred by holding Fu to the same standard of care as Vennerstrom in finding Fu negligent. The standard of care generally requires one to act as a reasonable person of ordinary prudence would have done in the same or similar circumstances. *Cerny v. Cedar Bluffs Jr./Sr. Pub. Sch.*, 262 Neb. 66, 628 N.W.2d 697 (2001). In *Cerny*, we noted:

> This basic standard, however, is not invariably applied in all negligence cases. For example, the standard is modified in circumstances in which the alleged tort-feasor possesses special knowledge, skill, training, or experience pertaining to the conduct in question that is superior to that of the ordinary person. Such a person is not held to the standard of a reasonably prudent person, but, rather, to a standard consistent with his or her specialized knowledge, skill, and other qualities.

(Citations omitted.) 262 Neb. at 73, 628 N.W.2d at 704.

Determining the standard of care to be applied in a particular case is a question of law, and the duty of care does "not exist in the abstract, but must be measured against a particular set of facts and circumstances." *Id.* at 74, 628 N.W.2d at 704. Therefore, the standard of care applicable to Fu is that of a reasonably prudent graduate student with Fu's level of education and experience. The trial court in its order evaluated Fu's conduct based on the standard of care expected of a graduate student "working toward his doctorate . . . [with] over 10 years of research experience." Accordingly, we determine the trial court applied the proper standard of care to Fu. This assignment of error is without merit.

In his final assignment of error, Fu asserts the court erred in finding Fu assumed the risk involved in conducting HF-4-21. However, a review of the trial court's order does not reveal any finding that Fu assumed the risk of conducting HF-4-21. Instead, the order finds that Vennerstrom's negligence was not a proximate cause of the explosion, and as a result, UNMC was not liable for Fu's injuries. Any finding on the issue of assumption of risk would have been unnecessary in light of the trial court's determination that Fu had failed to show that his injuries

were proximately caused by UNMC. This assignment of error is similarly without merit.

Because this court determines that Fu's assignments of error are without merit, it is not necessary to reach UNMC's second assignment of error in its cross-appeal.

## CONCLUSION

The decision of the trial court finding in favor of UNMC is affirmed.

AFFIRMED.

STEPHAN, J., not participating.