TAUNIA FUHRMAN, APPELLEE, V.
STATE OF NEBRASKA ET AL., APPELLANTS.
655 N.W.2d 866

Filed January 24, 2003.   No. S-01-767.

Don Stenberg, Attorney General, Royce N. Harper, and Michelle M. Lewon, Senior Certified Law Student, for appellants.

Michael F. Coyle and Timothy J. Thalken, of Fraser, Stryker, Meusey, Olson, Boyer & Bloch, P.C., for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

MILLER-LERMAN, J.
## I. NATURE OF CASE
Taunia Fuhrman filed a petition under the State Tort Claims Act alleging the State of Nebraska; the Department of Health and Human Services, formerly known as the Department of Social Services (DHHS); and Pam Curry, a DHHS employee (collectively appellants), were liable to Fuhrman for damages she sustained on December 12, 1995, when a ward of the State assaulted Fuhrman at Immanuel Medical Center (Immanuel) in Omaha, Nebraska. Following a bench trial, the Douglas County District Court entered judgment in Fuhrman's favor in the amount of $171,829.59. Appellants filed this appeal. We affirm.

## II. STATEMENT OF FACTS
Since November 23, 1988, DHHS has been the legal guardian of Jeffrey L., a minor born on December 4, 1981. After becoming a ward of the State, Jeffrey was placed in either foster care or a care facility. Prior to December 12, 1995, his placement had changed at least 36 times. The turnover was due in part to Jeffrey's physical violence against his caregivers and others. The record reflects that Jeffrey was large and strong for his age. On December 12, Jeffrey weighed approximately 200 pounds.

The history of Jeffrey's conduct was known to DHHS and documented in its records. Those records detailed 27 separate incidents in which Jeffrey assaulted a staff member or someone else at the location of his placement and which had occurred prior to October 1995, when he was transferred to Immanuel. These incidents included: (1) hitting a staff member who sustained injuries

necessitating crutches; (2) attacking a staff member with a croquet mallet; (3) biting a staff member so that the staff member required a tetanus shot; (4) assaulting two staff members, as a result of which one required crutches and the other needed stitches; and (5) choking, punching, and pulling the hair of a staff member. As a result of these and other incidents, Jeffrey had been arrested and convicted of criminal assault on three separate occasions. Many of the attacks involved female staff members, and in this connection, DHHS' records indicated that Jeffrey was "more likely to become angry and aggressive with female authority figures" and that he might target females "in particular."

In October 1995, Jeffrey's DHHS caseworker was Susan Hensler. Hensler was aware of Jeffrey's history of physical violence and his assaultive behavior. Hensler had taken over responsibility for Jeffrey's file in June 1995, at which time, she had been advised by another DHHS caseworker that she should use caution in dealing with Jeffrey because he was violent and that Hensler ought not to be alone with him.

On October 19, 1995, Hensler received a telephone call from the director of the Boys and Girls Home and Family Services in South Sioux City, Nebraska (Boys and Girls Home), where Jeffrey was a resident, seeking the removal of Jeffrey from the facility. In the week prior to his discharge from the Boys and Girls Home, Jeffrey had had 13 aggressive episodes. According to the discharge papers, "[o]n three different occasions, [Jeffrey] bit staff members during physical confrontations. These bites broke the skin and required the staff members to seek medical attention. [Jeffrey] also engaged in self harming behaviors during his explosive episodes . . . . [Jeffrey] repeatedly threatened to kill himself and/or to kill others." The director of the Boys and Girls Home advised Hensler that he wanted Jeffrey transferred immediately. Although Hensler was not given the details regarding Jeffrey's recent behavior, Hensler testified that the director threatened that Jeffrey would simply be "dropped on the street[s] of Omaha" if alternate placement arrangements were not made.

As a result of the director's telephone call, Hensler arranged to place Jeffrey at Immanuel on October 19, 1995. Immanuel is an acute care center, which treats psychiatric patients who cannot be

managed on an outpatient basis and who require immediate hospitalization for safety, diagnosis, and treatment. At no time did Hensler provide Immanuel with the details concerning why Jeffrey was being transferred from the Boys and Girls Home.

After making arrangements to place Jeffrey with Immanuel, pursuant to 474 Neb. Admin. Code, ch. 4, § 009.20E (1991), Hensler drove to the hospital to meet the Boys and Girls Home representative traveling with Jeffrey and to facilitate Jeffrey's admission into the hospital. Section 009.20E provides, in pertinent part, as follows:

Placement: At the time of placement, the [case]worker shall -

1. Accompany the parent(s) and child to the foster home or placement facility, observing reactions and answering relevant questions . . . .

. . . .

4. Give the . . . caregiver a copy of the Child's Health Record, and discuss the ward's medical needs with the . . . facility staff . . . .

5. Answer the . . . caregiver(s)' questions[.]

Further, pursuant to 474 Neb. Admin. Code, ch. 4, § 009.20B (1988), when preparing for the placement of a child under DHHS' authority, the caseworker is to gather certain information and provide it to the new caregiver. Included in the information to be provided to the receiving caregiver is information regarding "[t]he child's daily habits and behaviors, particularly any known or suspected tendencies which could be dangerous or detrimental to the child himself/herself, a foster or adoptive family member, facility staff, or other, including but not limited to . . . [v]iolence . . . ."

When Jeffrey had not arrived at Immanuel by 6:30 p.m. on October 19, 1995, and notwithstanding the requirements of § 009.20, Hensler left Immanuel. Later that evening, Hensler called the hospital and was told Jeffrey had arrived and had been admitted. That same evening, Hensler had a telephone conversation with someone at Immanuel's access center with respect to Jeffrey's admission. Hensler provided the hospital with Jeffrey's name, address, and insurance information. In this regard, Hensler testified that on October 19, she talked on the telephone

to someone at the access center named "Peg." Hensler testified that during this conversation, she informed Peg that Jeffrey was physically aggressive. Hensler admitted that she did not know where Peg was physically located. "Peg" was not identified by any witness at trial.

It is undisputed that Hensler did not tell anyone at Immanuel that Jeffrey had assaulted at least 27 people, that he had three separate convictions for assault, or that he was likely to target female staff members. It is also undisputed that Hensler did not knowingly talk with any members of the psychiatric staff at Immanuel who were responsible for caring for or treating Jeffrey regarding Jeffrey's propensity for violence and his previous assaults. Furthermore, it is undisputed that despite the wealth of records DHHS possessed regarding Jeffrey's history of violence and Hensler's knowledge of Jeffrey's assaultive behavior, neither Hensler nor any other DHHS representative gave Immanuel the documentation concerning Jeffrey's numerous placements and violent behavior.

Following his admission to Immanuel, it is undisputed that Jeffrey acted out on several occasions. On December 12, 1995, while a patient at Immanuel, Jeffrey became angry and left his group therapy session. Fuhrman, a psychiatric technician with Immanuel, followed Jeffrey and convinced him to go to a "quiet room." On the way to the quiet room, Jeffrey ran down the hall, tore the holiday decorations off the wall, and turned to Fuhrman and said he was going to kill her. He then proceeded to choke her, knee her, and pull large portions of her hair from her scalp, while stating, "I'm going to kill her" and "She's not dead yet." It took 12 adults to pull Jeffrey off of Fuhrman. At the time of the attack, Fuhrman was 24 years of age, stood 5 feet 1 inch tall, and weighed 105 pounds. At the time of the attack, the record reflects that Jeffrey was 14 years old and weighed approximately 200 pounds.

Fuhrman was seriously injured as a result of Jeffrey's attack and incurred medical expenses in excess of $16,800. She was not able to return to her former position as a psychiatric technician and has held a variety of jobs since the incident. At trial, Fuhrman testified that she was never informed regarding Jeffrey's previous assaults on caregivers, was never told that

Jeffrey would direct aggression at female caregivers, and did not know about his previous convictions for assault.

Fuhrman filed a claim pursuant to the State Tort Claims Act. See Neb. Rev. Stat. § 81-8,209 et seq. (Reissue 1996 & Cum. Supp. 2002). The State denied Fuhrman's claim, and thereafter, Fuhrman filed a lawsuit against appellants. In her amended and controlling petition, Fuhrman claimed that appellants were negligent in failing to disclose to Immanuel and its employees information regarding Jeffrey's "aggressive and uncontrollable assaultive behavior."

Fuhrman's case was tried to the district court on July 12 through 14, and 31, 2000. The record contains approximately 900 pages of testimony from 10 witnesses and 44 exhibits. Near the close of trial, appellants moved for leave to amend their answer to include the affirmative defenses of sovereign and qualified immunity, based on their understanding that Fuhrman was asserting that appellants had misrepresented Jeffrey's medical history. The district court denied appellants' motion.

In an order filed May 1, 2001, the district court made numerous findings of fact to the effect that DHHS possessed considerable information regarding Jeffrey's history of violent and dangerous behavior and propensities and that DHHS had failed to disclose such information to Immanuel. The district court concluded that appellants had a duty to disclose such information but had breached their duty to disclose such information to Immanuel and its employees. The district court further concluded that this breach was the proximate cause of Fuhrman's injuries and damages. The district court entered judgment in favor of Fuhrman. Fuhrman was awarded damages in the amount of $171,829.59. Appellants then filed this appeal.

### III. ASSIGNMENTS OF ERROR

On appeal, appellants allege two assignments of error. Appellants claim, restated and renumbered, that the district court erred (1) in denying appellants' motion to amend their answer to include the affirmative defenses of sovereign and qualified immunity and (2) in determining that appellants were negligent in failing to disclose the information regarding Jeffrey's violent and dangerous propensities.

## IV. STANDARDS OF REVIEW

■ A decision to grant or deny an amendment to a pleading rests in the discretion of the trial court. *McDonald v. Myre*, 262 Neb. 171, 631 N.W.2d 125 (2001).

■ In actions brought pursuant to the State Tort Claims Act, the factual findings of the trial court will not be disturbed on appeal unless they are clearly wrong, and when determining the sufficiency of the evidence to sustain the verdict, it must be considered in the light most favorable to the successful party. *Fu v. State*, 263 Neb. 848, 643 N.W.2d 659 (2002). Every controverted fact must be resolved in favor of such party, and it is entitled to the benefit of every inference that can reasonably be deduced from the evidence.

## V. ANALYSIS

### 1. AMENDMENT TO ANSWER TO ADD
### AFFIRMATIVE DEFENSES

Appellants claim that the district court erred in denying their motion to amend their answer during the course of the trial to assert the affirmative defenses of sovereign and qualified immunity. Appellants argue that although pleaded as a failure-to-disclose-information case, Fuhrman's case against appellants at trial was fundamentally based on misrepresentation, and that the State Tort Claims Act does not provide a remedy for actions arising from misrepresentation. See § 81-8,219(4). Appellants acknowledge that sovereign and qualified immunity are affirmative defenses which should be affirmatively pleaded or are considered waived. *Lawry v. County of Sarpy*, 254 Neb. 193, 575 N.W.2d 605 (1998) (exceptions found in § 81-8,219 are matters of defense which must be pleaded and proved by State). See, also, *Jameson v. Liquid Controls Corp.*, 260 Neb. 489, 618 N.W.2d 637 (2000) (affirmative defense must be successfully pleaded to be considered). Appellants nevertheless assert that they should have been allowed to amend their answer to conform to the proof at trial.

In her amended petition, Fuhrman alleged that appellants had failed to disclose information. At trial, Fuhrman offered evidence for the purpose of establishing that appellants had totally failed to disclose the lengthy and recent history pertaining to

Jeffrey's violent propensities. Neither Fuhrman's theory of the case nor her evidence was based on misrepresentation, but, rather, on a complete failure to convey the critical information, without an inference that this was deliberately done.

A decision to grant or deny an amendment to a pleading rests in the discretion of the trial court. *McDonald, supra.* The district court did not abuse its discretion in this case. The district court's order of May 1, 2001, states that the action "arises" out of appellants' failure to inform Immanuel and its employees of Jeffrey's propensities. In the same order, the district court concluded that appellants were "negligent in failing to . . . inform Immanuel and its employees of [Jeffrey's] violent and dangerous propensities . . . when he was admitted to Immanuel." The district court's decision in favor of Fuhrman was based on failure to disclose information.

Given the pleadings, the record in this case, and the district court's order, we conclude that the district court did not abuse its discretion in denying appellants' motion for leave to amend their answer. This assignment of error is without merit.

## 2. NEGLIGENCE

### (a) Duty to Disclose Information

Appellants contend generally that they met their duty in connection with the placement of Jeffrey at Immanuel and that in any event, because Jeffrey's aggressive behavior was apparent, the district court erred in concluding that appellants were negligent.

In order to recover in a negligence action brought pursuant to the State Tort Claims Act, a plaintiff must show a legal duty owed by the defendant to the plaintiff, a breach of such duty, causation, and damages. *Fu v. State*, 263 Neb. 848, 643 N.W.2d 659 (2002). The threshold issue in any negligence action is whether the defendant owes a legal duty to the plaintiff. *Id.* If there is no legal duty, there is no actionable negligence. *Id.*

Whether a legal duty exists for actionable negligence is a question of law dependent on the facts in a particular situation. *Id.* In determining whether a legal duty exists, this court employs a risk-utility test, considering (1) the magnitude of the risk, (2) the relationship of the parties, (3) the nature of the attendant risk,

(4) the opportunity and ability to exercise care, (5) the foreseeability of the harm, and (6) the policy interest in the proposed solution. *Sharkey v. Board of Regents*, 260 Neb. 166, 615 N.W.2d 889 (2000). We have stated:

> " 'Foreseeability as it impacts duty determinations refers to " 'the knowledge of the risk of injury to be apprehended. The risk reasonably to be perceived defines the duty to be obeyed; it is the risk reasonably within the range of apprehension, of injury to another person, that is taken into account in determining the existence of the duty to exercise care.' " . . .' "
>
> . . . .
>
> . . . "[T]he law does not require precision in foreseeing the exact hazard or consequence which happens; it is sufficient if what occurs is one of the kinds of consequences which might reasonably be foreseen."

*Id.* at 179, 181, 615 N.W.2d at 900-01 (quoting *Knoll v. Board of Regents*, 258 Neb. 1, 601 N.W.2d 757 (1999)). Foreseeability in the context of a legal duty is a question of law. *Fu, supra.*

Based on the facts of the case, we have previously recognized that when DHHS had "ample information that [a State ward] had a history of violent and abusive behavior" and was faced with questions regarding the potential risk posed to children who were exposed to the ward, DHHS "had a duty . . . to answer truthfully as to any knowledge it had or later acquired as to [the ward's] violent propensities and any danger that [other children] might encounter by being left alone with [the ward]." *Anderson/ Couvillon v. Nebraska Dept. of Social Servs.*, 248 Neb. 651, 658, 538 N.W.2d 732, 738 (1995). See, generally, *Johnson v. State of California*, 69 Cal. 2d 782, 447 P.2d 352, 73 Cal. Rptr. 240 (1968) (discussing that when state placed violent youth with caregivers, state was obligated to inform caregivers regarding youth's latent, dangerous qualities and that state owed duty to such persons to inform them of peril).

■ The evidence in this case shows that pursuant to § 009.20B, when preparing for the placement of a child under DHHS' authority, a DHHS caseworker is to gather certain information and provide that information to the caregiver, including information regarding the child's tendency to be violent. The

record reflects that one of the purposes behind providing this information is to protect those persons providing care to the child. DHHS regulations also require that the caseworker be present when a child is being placed with the caregiver, to provide necessary information to the caregiver and to answer any questions. Contrary to the regulations, it is undisputed that Hensler was not present when Jeffrey was admitted to Immanuel and that at best, Hensler gave Immanuel generalized information regarding Jeffrey's tendency to be aggressive. It is undisputed that Hensler did not inform Immanuel that Jeffrey had previously assaulted at least 27 people, that he had three separate convictions for assault, or that he was likely to target female staff members. Curry testified that if such information was not provided to Immanuel, DHHS violated its own guidelines. We have previously stated that while violation of a regulation is not negligence per se, it is evidence of negligence. *Goodenow v. State*, 259 Neb. 375, 610 N.W.2d 19 (2000).

The evidence reflects that Immanuel places historical information regarding a patient in the patient's chart, so that individual staff members will have access to that information. Immanuel staff members testified that they rely upon such historical information's being included in the record when treating patients. It is undisputed that Jeffrey's chart at Immanuel did not contain information regarding his numerous placements, his assault convictions, or his propensity to target female staff members. Fuhrman testified that she was not informed that Jeffrey had assaulted 27 individuals, had been convicted of three assaults on caregivers, or would direct his aggression at female staff members, and that had she known this information, she would have handled Jeffrey differently. Given appellants' failure to disclose critical information, what occurred to Fuhrman was a consequence which might reasonably be foreseen. *Sharkey v. Board of Regents*, 260 Neb. 166, 615 N.W.2d 889 (2000); *Knoll v. Board of Regents*, 258 Neb. 1, 601 N.W.2d 757 (1999).

We conclude that under the facts of this case, appellants owed a duty to disclose to Immanuel for the benefit of its employees the critical information appellants possessed regarding Jeffrey's violent and dangerous propensities when Jeffrey was admitted

to Immanuel. DHHS' own regulations required the agency to disclose information regarding Jeffrey's history of violence to his caregivers in order to protect those individuals who were treating him. Additionally, it was reasonably foreseeable that Immanuel staff members, such as Fuhrman, who were in direct contact with Jeffrey, would be and were in fact at significant risk of injury because the information upon which caregivers would rely was not present in Jeffrey's file.

(b) Breach of Duty to Disclose

Appellants claim that the district court erred in determining that they breached their duty to disclose Jeffrey's violent propensities. Referring to the record, appellants assert that Hensler informed Immanuel that Jeffrey had a history of physical aggression and that such declaration satisfied appellants' duty to disclose information.

In a lengthy order, the district court recounted in detail the evidence that was adduced during trial. The district court included in its order a recitation of those facts which favored Fuhrman's case and those facts which favored appellants' defense. In so doing, the district court specifically found that "Hensler did not tell anyone of authority at Immanuel about [Jeffrey]'s history of violence, although she knew he was violent," and that DHHS "had a copy of all of [Jeffrey]'s records . . . but . . . never provided any of the information about [Jeffrey]'s assaults to anybody at Immanuel."

In actions brought pursuant to the State Tort Claims Act, the factual findings of the trial court will not be disturbed on appeal unless they are clearly wrong, and when determining the sufficiency of the evidence to sustain the verdict, it must be considered in the light most favorable to the successful party. Every controverted fact must be resolved in favor of such party, and it is entitled to the benefit of every inference that can reasonably be deduced from the evidence. *Fu v. State*, 263 Neb. 848, 643 N.W.2d 659 (2002). Given the record in this case, we determine that the district court's factual findings regarding breach are not clearly wrong and that the district court did not err in determining that appellants had breached their duty to disclose information regarding Jeffrey's history of violence.

## (c) Efficient Intervening Cause

Appellants claim that even if they did breach their duty to disclose information, their breach was not the proximate cause of Fuhrman's injuries. Instead, appellants claim that Immanuel's familiarity with Jeffrey since his admission to Immanuel and Immanuel's failure to warn and train Fuhrman were efficient intervening causes, and thus appellants' conduct did not proximately cause Fuhrman's injuries.

An efficient intervening cause is a new, independent force intervening between the defendant's negligent act and the plaintiff's injury by the negligence of a third person who had full control of the situation, whose negligence the defendant could not anticipate or contemplate, and whose negligence resulted directly in the plaintiff's injury. An efficient intervening cause must break the causal connection between the original wrong and the injury. *Sacco v. Carothers*, 253 Neb. 9, 567 N.W.2d 299 (1997).

The doctrine that an intervening act cuts off a tort-feasor's liability comes into play only when the intervening cause is not foreseeable. *Id.*; *Haselhorst v. State*, 240 Neb. 891, 485 N.W.2d 180 (1992). Foreseeability that affects proximate cause relates to the question of whether the specific act or omission of the defendant was such that the ultimate injury to the plaintiff reasonably flowed from the defendant's alleged breach of duty. See *Sacco, supra.* We have previously stated that

> a defendant cannot be relieved from liability for his or her negligence by the fact that the very harm from which the defendant has failed to protect the plaintiff has occurred. An action that was foreseeably within the scope of the risk occasioned by the defendant's negligence cannot be said to supersede that negligence.

*Id.* at 15, 567 N.W.2d at 304 (citing W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 44 (5th ed. 1984)).

In the instant case, appellants claim that Immanuel's familiarity with Jeffrey's behavior following his admission to Immanuel and Immanuel's purported failure to warn Fuhrman concerning Jeffrey's assaultive behavior and its purported failure to train Fuhrman in a method to respond to an assault by Jeffrey are efficient intervening causes superseding appellants'

negligent conduct. The error with this argument, however, is that without appellants' disclosure of information regarding Jeffrey's severe and extensive history of attacking his caregivers, his three criminal convictions for assault, and his tendency to target female caregivers, and despite Immanuel's familiarity with Jeffrey's acting out since his admission, Immanuel had insufficient knowledge of its purported need in this case to warn and train Fuhrman to respond to an assault by Jeffrey. Given appellants' failure to disclose Jeffrey's history to his caregivers, Immanuel's alleged failure to warn and train Fuhrman cannot be said to be an independent act that would break the causal connection between appellants' negligence and Fuhrman's injuries.

Based on the foregoing, we conclude that the district court did not err in determining that appellants had breached their duty to disclose information and that such breach was the proximate cause of Fuhrman's injuries and damages. Accordingly, we determine that there is no merit to this assignment of error.

## VI. CONCLUSION

For the foregoing reasons, we affirm the district court's judgment in favor of Fuhrman.

AFFIRMED.