774 N.W.2d 370 (2009)
278 Neb. 800
Elizabeth A. WILKE and Mark Wilke, Husband and Wife, Appellants,
v.
WOODHOUSE FORD, INC., a Nebraska Corporation, Appellee.
No. S-08-807.
Supreme Court of Nebraska.
November 6, 2009.
*374 Melany S. Chesterman, of Hauptman, O'Brien, Wolf & Lathrop, P.C., Omaha, for appellants.
Brian D. Nolan, of Nolan, Olson, Hansen, Lautenbaugh & Buckley, L.L.P., Omaha, for appellee.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
McCORMACK, J.

I. NATURE OF CASE
Elizabeth A. Wilke and her husband, Mark Wilke, purchased a van from Woodhouse Ford, Inc. (Woodhouse). That same day, Elizabeth was injured when their 3-year-old daughter allegedly pulled the gearshift out of park, allowing the van to roll over Elizabeth's foot and leg, causing her to fall and hit her head on a concrete driveway. The Wilkes testified that the key was out of the ignition at the time of the accident. The van was purchased that day from Woodhouse. Woodhouse sold the van to the Wilkes "as is" and disclaimed all implied warranties. The Wilkes brought suit against Woodhouse alleging two alternative theories: negligence and breach of implied warranty of merchantability. The district court entered summary judgment in favor of Woodhouse, and the Wilkes appealed. We moved the case to our docket pursuant to our statutory authority to regulate the caseloads of the appellate courts of this state.[1]

II. BACKGROUND
The Wilkes purchased a used 2002 Ford Econoline cargo van from Woodhouse on September 18, 2004. Mark is not a trained mechanic and has only a basic knowledge of mechanics. Before purchasing the van, Mark started the van's engine but did not test-drive the van. Mark felt that test-driving the van or inspecting it further was unnecessary because he had purchased "good vehicles from Woodhouse before."
The purchase agreement stated that the van was used and purchased "AS IS" and "WITHOUT ANY WARRANTY" in bold type. The agreement further provided in a smaller font, "DEALER HEREBY EXPRESSLY DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE . . . ." Both the Wilkes and the Woodhouse salesman signed the purchase agreement. There is no evidence that Woodhouse made any representations to the Wilkes regarding the condition or quality of the van.
Immediately after purchasing the van, the Wilkes drove directly to the home of their friend, approximately a 30- to 45-minute drive from the dealership. Elizabeth and her daughter drove in the family *375 vehicle, and Mark followed in the new van. Upon arriving, Mark pulled the van into the driveway, which was slightly sloped, and parked. Mark did not apply the emergency brake after he parked the van. The Wilkes both remembered Mark taking the key out of the ignition and putting it in his pocket after parking the van. Mark testified that he had no doubt that he took the key out of the ignition. And Elizabeth testified in her deposition that she did not hear any chimes or buzzers indicating that the key had been left in the ignition.
After parking the van, the Wilkes and their daughter went inside for approximately 30 minutes. They then went back outside to show their friend the new van. Mark opened the driver's-side door and the two doors in the back of the van. Elizabeth testified that she was standing directly behind the van and that Mark was sitting at the end of the van with their daughter on his lap. At some point, the daughter got down from Mark's lap and stood beside Elizabeth. Elizabeth testified that she turned her head to talk to their friend for a moment and that when she was turning back to look at Mark, she saw her daughter climbing into the driver's seat. Elizabeth immediately screamed for her daughter to get down, and Elizabeth ran around to the driver's side of the van.
Elizabeth testified that as she approached the side of the van, she saw her daughter with her left hand on the steering wheel and her right hand on the gearshift. According to Elizabeth, her daughter's legs were tucked underneath her and she was on her knees. Before getting to the driver's side, Elizabeth heard a "clunk," and then the van started rolling backward. Elizabeth explained that her daughter grabbed the gearshift to pull herself up to come to Elizabeth, but that Elizabeth shoved her back into the van to make sure she would not fall out as the van rolled backward.
As the van rolled backward, Elizabeth was hit by the door and her right foot got caught under the van's tire. The force caused her to fall backward onto the pavement and hit her head. According to Elizabeth, the left front tire rolled over her right foot and thigh. The tire missed her shoulder, but her shirt was pinned under the tire.
Once the van started to roll, Mark turned and saw his daughter in the front seat. Mark entered the van through the open back doors, pushed open the separator cage, and "dove for the brake pedal with [his] hand." The van stopped rolling at that point. Mark testified that he noticed his daughter was in the front seat after he realized the van was moving and that she was on the seat either on her knees or standing. Mark also testified that he did not know which gear the van was in as it rolled over Elizabeth but that he knew the gearshift was not "aligned with the P." After stopping the van, Mark moved the van to release Elizabeth's shirt. Elizabeth was taken by ambulance to a hospital.
The deputy sheriff's report regarding the accident states: "VEHICLE 1 WAS DISCOVERED TO HAVE A DEFETIVE SHIFT LEVER THAT WAS ABLE TO BE SHIFTED OUT OF PARK MODE WITHOUT DEPRESSING BRAKE PEDAL." The report does not explain or provide any details as to whether the key was in the ignition or how the defective gearshift was discovered.
Donald Jeffers, an automotive engineering consultant and the Wilkes' expert witness, conducted an investigation of the accident and prepared a report on his findings. In making his findings, Jeffers examined the State of Nebraska investigator's motor vehicle accident report, *376 color prints of photographs of the accident scene, transcripts of depositions and telephone interviews, Ford engineering drawings and shop manuals, the Federal Motor Vehicle Safety Standards, and Elizabeth's medical report.
In his report, Jeffers summarized parts of the telephone interview transcripts. According to Jeffers' report, the police officer who responded to the call to the 911 emergency dispatch service testified in his telephone interview that "`[he] got in the driver's side and moved the shift lever, which shouldn't have moved, and it went into neutral and drive out of park without stepping on the brake pedal.'" According to the Federal Motor Vehicle Safety Standards relied upon by Jeffers, vehicles which have an automatic transmission with a "park" position must "`prevent removal of the key unless the transmission or transmission shift lever is locked in "park" as the direct result of removing the key.'" The purpose of this feature is "`to reduce the incidence of crashes resulting from the rollaway of parked vehicles with automatic transmissions as a result of children moving the shift mechanism out of the "park" position.'"
After the accident, Elizabeth's father took the van to Woodhouse for the first of two repairs. The record does not contain a repair order regarding the first repair. However, it appears as though Woodhouse adjusted the linkage on the gearshift because it was not going into park completely.
According to Mark, the transmission continued to shift out of park without the key in the ignition after the first Woodhouse repair. Mark explained that he and Elizabeth's father tested it by pulling the gearshift without his foot on the brake and that the gearshift would go into any gear that he put it into. Woodhouse came and picked up the van a second time for repairs.
Matthew Eschliman is a Woodhouse employee, and portions of his deposition testimony were included in the record. Eschliman's deposition testimony indicates that there was excessive play in the gearshift. Specifically, Eschliman stated, "You could move the lever up and down excessively but not actually physically get it out of gear." Eschliman testified that although there was free play in the gearshift, the transmission would not shift from park to reverse without the key in the ignition. It is unclear from the record whether this observation was made before the first repair or the second repair.
The record suggests that Dustin Oppliger was the Woodhouse technician who actually repaired the van. Part of Oppliger's deposition was also included in the record. Oppliger testified that he checked the van before he made any repairs to see whether the gearshift would move. When asked if the gearshift had "free play from park to drive," Oppliger stated, "I wouldn't really call it free play. The shifter had free play, but not the actual linkage. You could feel the free play but you couldn'tÔÇö there was no strength there." Oppliger also testified that he parked the van on a steep hill and tried to pull the gearshift out of park but was unable to get the gearshift to shift out of park. In other words, Oppliger was allegedly unable to duplicate the problem. Even though the Woodhouse employees reportedly could not shift the van out of park without the key in the ignition and the brake depressed, Oppliger replaced the bushings and adjusted the shifter cable.
The repair order concerning the second repair states: "Customer Reports: WHEN KEY IS OUT OF IGNITION THE TRANS WILL COME OUT OF GEAR ENOUGH TO ROLL FREELY. *377 CHK AND ADVISE[.] Caused by ADJUSTED THE SHIFTER CABLE, R & I THE STEERING COLUMN & DISASSEMBLED THE SHIFT SHAFT, REPLACED THE BRGS. & RETEST[.]" The repair order also contains handwritten notes, which state: "Adjust shifter cable[.] R & R steering column[.] Disassemble found shift shaft [b]ushings worn out[.] Replaced them[.] Inspect shift lockout mechanism[.] Nothing worn on that[.] Reassemble and check[.] Works good."
After the second repair, a Woodhouse employee brought the van back to Mark, and Mark testified that when the van was brought back the second time, he could not get the gearshift to come out of park without the key in the ignition and the brake pedal depressed. In other words, according to Mark, the gearshift on the van worked properly after the second repair.
Based on his review and investigation, Jeffers concluded that "[t]hree separate failure modes caused and contributed" to the accident. According to Jeffers' report, the brake shift interlock system failed, the transmission shift cable was misadjusted, and the key shift interlock failed or malfunctioned. Jeffers did not make any determinations regarding whether the defect in the gearshift could have been discovered by a reasonable inspection.
It is undisputed that the van was not inspected by Woodhouse employees prior to the Wilkes' purchase. Eschliman explained in his deposition testimony that because of the high volume of vehicles traded in, there are times when the service department does not inspect used vehicles before they are resold. Oppliger testified similarly. He explained that Woodhouse gets "too many vehicles in that we can't keep up on inspecting every one of them." There is no indication in the record that Woodhouse was aware prior to the accident that the gearshift on the van was defective.
The Wilkes filed a petition, which was later amended, against Ford Motor Company and Woodhouse seeking damages for Elizabeth's injuries. Ford Motor Company has been dismissed, without prejudice, and is not a party in this appeal. The petition contains three theories of recovery, only two of which involve Woodhouse. In count II of the petition, the Wilkes allege that Woodhouse knew or should have known that the defective condition of the van would pose an unreasonable and foreseeable danger to its customer or, alternatively, that Woodhouse knew or should have known that the van was defective when it was sold and that such negligence was the proximate cause of Elizabeth's injuries. In count III of the petition, the Wilkes allege that Woodhouse impliedly warranted, pursuant to Neb. U.C.C.  2-314 (Reissue 2001), the van was merchantable and that Woodhouse breached that implied warranty. The district court granted Woodhouse's motion for summary judgment, and the Wilkes appeal.

III. ASSIGNMENTS OF ERROR
The Wilkes allege that the district court erred (1) as a matter of law in holding that no genuine issue of material fact exists and in granting summary judgment to Woodhouse and (2) in determining that used-car dealers can exclude through "as is" clauses an implied warranty of safety that involves the vehicle's inherently dangerous defects, because such exclusions violate public policy.

IV. STANDARD OF REVIEW
Summary judgment is proper if the pleadings and admissible evidence offered at the hearing show that there is no genuine issue as to any material facts or as *378 to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.[2] In reviewing a summary judgment, the court views the evidence in the light most favorable to the party against whom the judgment was granted, and the court gives that party the benefit of all reasonable inferences deducible from the evidence.[3]

V. ANALYSIS
This case presents two issues: (1) whether a car dealer can exclude through the use of an "as is" clause the implied warranty of merchantability and (2) whether a car dealer has a duty to inspect used vehicles for safety defects prior to selling the vehicle.

1. IMPLIED WARRANTY OF MERCHANTABILITY
The Wilkes' breach of warranty claim arises from the law of sales as codified in the Uniform Commercial Code (U.C.C.).[4] Historically, a warranty is an undertaking or assertion by the seller that the thing sold is as represented.[5] Under the U.C.C., warranties relating to goods sold can be either express or implied.[6] Under  2-314:
(1) Unless excluded or modified (section 2-316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind . . . .
(2) Goods to be merchantable must be at least such as
. . . .
(c) are fit for the ordinary purposes for which such goods are used[.]
The Wilkes contend that Woodhouse breached this express warranty of merchantability with respect to the van it sold to them.
As noted in the statutory language defining an implied warranty of merchantability, it exists "unless excluded or modified."[7] Section 2-316(3)(a) provides: "[U]nless the circumstances indicate otherwise, all implied warranties are excluded by expressions like `as is', `with all faults' or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty." The purchase agreement evidencing the sale of the van from Woodhouse to the Wilkes included a conspicuous statement that it was sold "as is," "without any warranty either expressed or implied," and further stated that Woodhouse was disclaiming any implied warranty of merchantability. This language met the requirements of  2-316(2) and (3)(a) for excluding an implied warranty of merchantability.
The Wilkes argue, however, that exclusion of an implied warranty of merchantability with respect to a safety defect would violate public policy and therefore should not be enforced by a court. In support of their argument, the Wilkes cite to general propositions defining public policy as restrictions on the freedom to contract in order to prevent acts injurious to the public.[8] But we have also explained *379 that it is the function of the Legislature, through the enactment of statutes, to declare what is the law and public policy of this state.[9] And our Legislature has provided, in  2-316, that the implied warranty of merchantability may be disclaimed or excluded.
The provisions of the U.C.C. which permit a seller to exclude warranties make no exception for warranties relating to the safety of the product. We conclude that the use of an "as is" clause to exclude the implied warranty of merchantability cannot be against the public policy of this state when it mirrors the statutory requirements specifically allowing for such exclusion.[10] Section 2-316 is the Legislature's clear expression of the public policy of this state. Therefore, the purchase agreement effectively disclaimed and excluded any implied or express warranties for the vehicle. As such, the district court properly entered summary judgment in favor of Woodhouse for the Wilkes' cause of action for breach of the implied warranty of merchantability.

2. NEGLIGENCE
The Wilkes also alleged a theory of recovery based on negligence. While a breach of warranty claim is based upon a seller's express or implied statements regarding the product, a negligence claim focuses on the seller's conduct.[11] A common-law duty exists to use due care so as not to negligently injure another person.[12] Thus, the absence of implied warranties does not absolve Woodhouse from any potential liability resulting from its failure to exercise reasonable care.[13] In other words, nothing in the statutes dealing with exclusion of implied warranties allows for the exclusion of tort liability.
The Wilkes alleged that Woodhouse was negligent because it failed to reasonably inspect the van for safety defects prior to its sale and that but for such negligence, Elizabeth would not have sustained her injuries by being run over by the van.
Ordinary negligence is defined as the doing of something that a reasonably careful person would not do under similar circumstances, or the failing to do something that a reasonably careful person would do under similar circumstances.[14] In order to prevail in a negligence action, there must be a legal duty on the part of the defendant to protect the plaintiff from injury, a failure to discharge that duty, and damage proximately caused by the failure to discharge that duty.[15]

(a) Duty
Woodhouse first maintains that it had no duty to inspect the van prior to its *380 sale. In negligence cases, a duty may be defined as an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another.[16] When determining whether a legal duty exists, a court employs a risk-utility test concerning (1) the magnitude of the risk, (2) the relationship of the parties, (3) the nature of the attendant risk, (4) the opportunity and ability to exercise care, (5) the foreseeability of the harm, and (6) the policy interest in the proposed solution.[17]
The existence of a duty and the identification of the applicable standard of care are questions of law, but the ultimate determination of whether a party deviated from the standard of care and was therefore negligent is a question of fact.[18] To resolve the issue, a finder of fact must determine what conduct the standard of care would require under the particular circumstances presented by the evidence and whether the conduct of the alleged tort-feasor conformed with the standard.[19]
We have never before addressed whether a used-car dealer has a duty to its customers to inspect vehicles for safety defects before they are sold. Most courts which have considered the issue have recognized a limited duty on the part of the dealer to inspect for patent safety defects existing at the time of sale. For example, Minnesota courts have held that the seller of a used vehicle intended for use upon the public highways has a duty to the public using such highways to exercise reasonable care in supplying the purchaser with a vehicle which will not constitute a menace or source of danger, so that liability attaches to the seller for injuries which are the result of patent defects in the vehicle, or defects which could have been discovered in the exercise of reasonable care.[20] Ohio courts have held that even when a dealer sells a used vehicle "as is," the dealer has a duty to exercise reasonable care in examining the vehicle to discover defects which would make the vehicle dangerous to users or those who might come in contact with them, and upon discovery, to correct those defects or at least give warning to the purchaser.[21] The Kentucky Court of Appeals has noted that used cars are more likely to be subject to mechanical defects than new vehicles and that the dealer is in a better position than the average consumer to "discover what defects might exist in any particular car to make it a menace to the public," holding that "[w]e are of the opinion it is not too harsh a rule to require these dealers to use reasonable care in inspecting used cars before resale to discover these defects, which the customer often cannot discover until too late."[22] In Kopischke v. First Continental Corp.,[23] the Montana Supreme Court held that a used-car dealer had a duty to inspect a vehicle for safety defects prior to sale, notwithstanding the fact that *381 the vehicle was sold "as is." The court reasoned:
When the ordinary person purchases a car "as is," he expects to have to perform certain repairs to keep the car in good condition. He does not expect to purchase a death trap. Public policy requires a used car dealer to inspect the cars he sells and to make sure they are in safe, working condition. This duty cannot be waived by the use of a magic talisman in the form of an "as is" provision.[24]
But courts which have recognized a duty on the part of used-car dealers to inspect for safety defects prior to sale have also emphasized that the duty is limited. Courts have stated that used-car dealers are not insurers and therefore are not liable for latent defects in the vehicle.[25] Courts have limited the duty to inspect for patent defects[26] affecting the minimum essentials for safe operation of the vehicle.[27] Dealers are not required to disassemble the vehicle to inspect for latent defects,[28] and they are not responsible for the continuing safety of the vehicles they sell.[29]
Applying our risk-utility test for the existence of a legal duty to use reasonable care, we conclude that there is a relatively great magnitude of risk of injury in the circumstance where an unknowing buyer drives off the dealer's lot in a used vehicle which has a patent safety defect, such as defective brakes or steering. The dealer is better equipped than the purchaser to perceive such a defect before it causes harm. The nature of the risk is such that personal injury or death could result not only with respect to the purchaser of the defective vehicle, but to other members of the motoring public. The dealer has the earliest opportunity to discover and repair a patent safety defect in a used vehicle. An unknown safety defect existing at the time of sale poses foreseeable harm to the purchaser and the general public, and there exists a policy interest in requiring reasonable conduct on the part of the dealer to prevent such harm.
We, therefore, hold that a commercial dealer of used vehicles intended for use on public streets and highways has a duty to conduct a reasonable inspection of the vehicle prior to sale in order to determine whether there are any patent defects existing at the time of sale which would make the vehicle unsafe for ordinary operation and, upon discovery of such a defect, to either repair it or warn a prospective purchaser of its existence. The dealer has no duty to disassemble the vehicle to discover latent defects or to anticipate the future development of safety defects which do not exist at the time of sale. The tort duty we recognize today is not affected by a valid disclaimer or exclusion of U.C.C. warranties, because such contractual provisions do not absolve a seller from exercising reasonable care to prevent foreseeable harm.
Tort liability is not based upon representations or warranties. Rather, it is based upon a duty imposed by the law upon one who may foresee that his or her *382 actions or failure to act may result in injury to others.[30]
That being the case, whether or not the court properly entered summary judgment in favor of Woodhouse depends upon whether Woodhouse breached this duty. It is undisputed that Woodhouse did not inspect the van prior to selling it. However, that alone does not rise to the level of a breach of the applicable standard of care, because its duty extends only to patent, not to latent, defects. Thus, a breach of duty occurred if a reasonable inspection would have revealed the alleged defect in the gearshift. This is a question of fact that must be decided by the fact finder. A party moving for summary judgment has the burden to show that no genuine issue of material fact exists and must produce sufficient evidence to demonstrate that the moving party is entitled to judgment as a matter of law if the evidence presented for summary judgment remains uncontroverted.[31] After the moving party has shown facts entitling it to a judgment as a matter of law, the opposing party has the burden to present evidence showing an issue of material fact which prevents judgment as a matter of law for the moving party.[32] The record presents conflicting testimony as to whether the gearshift malfunctioned occasionally or regularly. According to Mark, the gearshift malfunctioned regularly. Additionally, the officer who responded to the accident indicated that the gearshift came out of park without the key in the ignition. However, Woodhouse employees claim that they could not get the gearshift to malfunction. As such, there is a genuine issue of material fact whether a reasonable inspection of the van would have revealed any alleged defect.

(b) Causation
Woodhouse argues that even if there is a duty that was breached, there is no material issue of fact that Woodhouse was not the proximate cause of the accident. Rather, Woodhouse asserts that Mark and the child were the proximate cause of the accident.
Determination of causation is, ordinarily, a matter for the trier of fact.[33] To establish proximate cause, the plaintiff must meet three basic requirements: (1) Without the negligent action, the injury would not have occurred, commonly known as the "but for" rule; (2) the injury was a natural and probable result of the negligence; and (3) there was no efficient intervening cause.[34]
Assuming that Woodhouse breached its duty to reasonably inspect, Woodhouse proximately caused the vehicle to be placed into the hands of the Wilkes with a defect that could have been discovered by a reasonable inspection. This defect undoubtedly existed at the time of sale. And it is undisputed that the van was not altered in any way prior to the incident. But Woodhouse first argues that Mark's failure to set the parking brake was the proximate cause of the accident. In doing so, however, Woodhouse confuses the concepts of proximate causation and contributory negligence. Woodhouse is *383 really arguing that Mark was contributorily negligent by not using the parking brake. Plaintiffs are contributorily negligent if (1) they fail to protect themselves from injury, (2) their conduct occurs and cooperates with the defendant's actionable negligence, and (3) their conduct contributes to their injuries as a proximate cause.[35] Whether or not the Wilkes were contributorily negligent to the point where recovery is precluded is a question for the trier of fact, and Woodhouse's allegations regarding Mark's failure to implement the parking brake are insufficient to warrant summary judgment in Woodhouse's favor.[36]
Second, Woodhouse argues that the Wilkes' daughter was the proximate cause of the accident because she manipulated the gearshift, causing the accident. Essentially, Woodhouse is arguing that viewing the facts in the light most favorable to the Wilkes, the daughter's actions constituted an efficient intervening cause, warranting judgment as a matter of law in its favor. An efficient intervening cause is new and independent conduct of a third person, which itself is a proximate cause of the injury in question and breaks the causal connection between the original conduct and the injury.[37] The causal connection is severed when (1) the negligent actions of a third party intervene, (2) the third party had full control of the situation, (3) the third party's negligence could not have been anticipated by the defendant, and (4) the third party's negligence directly resulted in injury to the plaintiff.[38] The doctrine that an intervening act cuts off a tort-feasor's liability comes into play only when the intervening cause is not foreseeable.[39] But if a third party's negligence is reasonably foreseeable, then the third party's negligence is not an efficient intervening cause as a matter of law.[40] The record contains evidence that if the van had been operating properly, the gearshift should not have come out of park unless the key was in the ignition and the brake pedal was depressed. A jury could find that it is foreseeable that an accident could occur if a young child was able to take the vehicle out of park without the key in the ignition and the brake pedal depressed. Thus, we conclude that there is a genuine issue of material fact whether the alleged efficient intervening cause was foreseeable by Woodhouse, and therefore judgment as a matter of law is precluded.[41]

VI. CONCLUSION
We conclude that Woodhouse effectively disclaimed all implied warranties, including the warranty of merchantability. But we also conclude that commercial dealers of used vehicles have a duty to exercise reasonable care to discover any existing safety defects that are patent or discoverable in the exercise of reasonable care or through reasonable inspection. Because there are genuine issues of material fact as to whether Woodhouse breached its duty of care and, if so, whether Woodhouse's breach was the proximate cause of Elizabeth's injuries, we conclude that the district *384 court incorrectly granted summary judgment in favor of Woodhouse on the Wilkes' negligence claim. We affirm the grant of summary judgment in favor of Woodhouse on count III and reverse the judgment of the district court granting summary judgment in favor of Woodhouse on count II.
AFFIRMED IN PART, AND IN PART REVERSED.
NOTES
[1] Neb.Rev.Stat.  24-1106(3) (Reissue 2008).
[2] Jardine v. McVey, 276 Neb. 1023, 759 N.W.2d 690 (2009).
[3] Id.
[4] See Neb. U.C.C.  2-101 to 2-725 (Reissue 2001).
[5] See Erskine v. Swanson, 45 Neb. 767, 64 N.W. 216 (1895).
[6] See  2-313 and 2-315.
[7]  2-315.
[8] See New Light Co. v. Wells Fargo Alarm Servs., 247 Neb. 57, 525 N.W.2d 25 (1994).
[9] State v. Barranco, 278 Neb. 165, 769 N.W.2d 343 (2009).
[10] See, Continental Western Ins. Co. v. Conn, 262 Neb. 147, 629 N.W.2d 494 (2001); Koperski v. Husker Dodge, Inc., 208 Neb. 29, 302 N.W.2d 655 (1981). See, also, Peterson v. North American Plant Breeders, 218 Neb. 258, 354 N.W.2d 625 (1984).
[11] See Freeman v. Hoffman-La Roche, Inc., 260 Neb. 552, 618 N.W.2d 827 (2000).
[12] Merrick v. Thomas, 246 Neb. 658, 522 N.W.2d 402 (1994).
[13] See Fleming v. Stoddard Wendle Motor Co., 70 Wash.2d 465, 423 P.2d 926 (1967). See, also, Kopischke v. First Continental Corp., 187 Mont. 471, 610 P.2d 668 (1980). See, generally, Freeman v. Hoffman-La Roche, Inc., supra note 11. But see New Texas Auto v. Gomez De Hernandez, 249 S.W.3d 400 (Tex. 2008).
[14] Caguioa v. Fellman, 275 Neb. 455, 747 N.W.2d 623 (2008); Bargmann v. Soll Oil Co., 253 Neb. 1018, 574 N.W.2d 478 (1998).
[15] Bargmann v. Soll Oil. Co., supra note 14.
[16] Erickson v. U-Haul Internat., 274 Neb. 236, 738 N.W.2d 453 (2007).
[17] See, Munstermann v. Alegent Health Immanuel Medical Center, 271 Neb. 834, 716 N.W.2d 73 (2006); Fuhrman v. State, 265 Neb. 176, 655 N.W.2d 866 (2003).
[18] Cerny v. Cedar Bluffs Jr./Sr. Pub. Sch., 262 Neb. 66, 628 N.W.2d 697 (2001).
[19] Id.
[20] Crothers by Crothers v. Cohen, 384 N.W.2d 562 (Minn.App.1986); Kothe v. Tysdale, 233 Minn. 163, 46 N.W.2d 233 (1951).
[21] See, Stamper v. Parr-Ruckman Home Town Motor Sales, 25 Ohio St.2d 1, 265 N.E.2d 785 (1971); Thrash v. U-Drive-It Co., 158 Ohio St. 465, 110 N.E.2d 419 (1953).
[22] Gaidry Motors v. Brannon, 268 S.W.2d 627, 629 (Ky.App. 1954).
[23] Kopischke v. First Continental Corp., supra note 13.
[24] Id. at 491-92, 610 P.2d at 679.
[25] Stamper v. Motor Sales, supra note 21; Armour v. Haskins, 275 S.W.2d 580 (Ky.App. 1955); Thrash v. U-Drive-It, supra note 21.
[26] Rogers v. Hilger Chevrolet Co., 155 Mont. 1, 465 P.2d 834 (1970).
[27] Foley v. Harrison Ave. Motor Co., 267 Mont. 200, 883 P.2d 100 (1994).
[28] Crothers by Crothers v. Cohen, supra note 20.
[29] Armour v. Haskins, supra note 25.
[30] Gaidry Motors v. Brannon, supra note 22. See, Turner v. International Harvester Company, 133 N.J.Super. 277, 336 A.2d 62 (1975); Kothe v. Tysdale, supra note 20.
[31] See Kline v. Farmers Ins. Exch., 277 Neb. 874, 766 N.W.2d 118 (2009).
[32] See id.
[33] Dolberg v. Paltani, 250 Neb. 297, 549 N.W.2d 635 (1996); Merrick v. Thomas, supra note 12.
[34] Merrick v. Thomas, supra note 12.
[35] Fickle v. State, 273 Neb. 990, 735 N.W.2d 754 (2007).
[36] See Skinner v. Ogallala Pub. Sch. Dist. No. 1, 262 Neb. 387, 631 N.W.2d 510 (2001).
[37] Malolepszy v. State, 273 Neb. 313, 729 N.W.2d 669 (2007).
[38] Id.
[39] Delaware v. Valls, 226 Neb. 140, 409 N.W.2d 621 (1987).
[40] See Maresh v. State, 241 Neb. 496, 489 N.W.2d 298 (1992).
[41] See Kozicki v. Dragon, 255 Neb. 248, 583 N.W.2d 336 (1998).